*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-0795**

In the Matter of the Civil Commitment of: Matthew Alan Radke.

**Filed September 15, 2014
Affirmed
Hudson, Judge**

Freeborn County District Court
File No. 24-PR-12-625

Ryan B. Magnus, Jeremy J. Nauman, Jones and Magnus, Attorneys at Law, Mankato, Minnesota (for appellant)

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Craig S. Nelson, Freeborn County Attorney, Albert Lea, Minnesota (for respondent)

Considered and decided by Hudson, Presiding Judge; Ross, Judge; and Schellhas, Judge.

# UNPUBLISHED OPINION

**HUDSON**, Judge

In this appeal from his civil commitment as a sexually dangerous person (SDP), appellant argues that the district court clearly erred by discrediting one expert's actuarial assessment, the SRA-FV, as a new measure, not yet widely used in Minnesota, and crediting the opinion of another expert, who relied partially on structured clinical judgment. He also argues that the district court's findings reflect factor repetition, which is impermissible under *In re Civil Commitment of Ince*, 847 N.W.2d 13 (Minn. 2014). He

further challenges the district court's determination that he failed to show the availability of a less-restrictive alternative meeting his needs and public-safety requirements. We affirm.

**FACTS**

In April 2012, a petition was filed to commit appellant Matthew Alan Radke as an SDP. *See* Minn. Stat. § 253D.02, subd. 16 (Supp. 2013) (defining standards for commitment as a sexually dangerous person).[1] In 2008, appellant was convicted of second-degree criminal sexual conduct based on repeated sexual contact with his girlfriend's daughter when she was four to ten years old. In 2007, he pleaded guilty to fifth-degree criminal sexual conduct after grabbing a woman at a facility where he was undergoing chemical-dependency treatment. As a result of the second-degree criminal sexual conduct conviction, appellant was sentenced to 21 months in prison, with execution stayed and probation for 0-20 years.

In 2008, appellant entered outpatient sex-offender treatment at the Safety Center, Inc. After reports in 2009 and 2010 that he violated probation conditions by viewing and masturbating to adult and child pornography, his probation was restricted and treatment modified. In 2012, he was convicted of interference with privacy after he engaged in window peeping, masturbated when he returned home, and then reported his behavior. Appellant was suspended from treatment at the Safety Center, his probation was revoked,

---

[1] In 2013, the Minnesota legislature recodified the statutes governing civil commitment of sexually dangerous persons. *See* 2013 Minn. Laws, ch. 49 at 213–14 (codified at Minn. Stat. ch. 253D). We cite the current versions of the statutes because, for purposes of this case, the legislature clarified pre-existing law without making substantive changes. *See Braylock v. Jesson*, 819 N.W.2d 585, 588–89 (Minn. 2012).

and he was sent to prison. In 1996, he was diagnosed with major depression, borderline passive-aggressive personality traits, intense and unstable personal relationships, and a global assessment of impairment in social functioning.

At a hearing on the commitment petition, appellant's probation agent in the Minnesota Department of Corrections outpatient enhanced sex-offender program testified that appellant lacks impulse control and admitted to sexual fantasies about young children, raising concerns about a future sexual offense. The agent testified that he was also concerned because appellant had stated that he engaged in window peeping "because he deserved it" after treatment success.

Appellant's psychologist at the Safety Center testified that appellant showed positive effects from his three-hour-per-weekday treatment and that he would be considered for readmission because his last offense occurred during the relapse-prevention phase. The psychologist testified, however, that he was concerned by appellant's window peeping near the end of treatment and his inability to use treatment techniques to stop this behavior.

Appellant testified that he had learned from his treatment at the Safety Center and was able to control his impulses "to a certain point." He testified that he did not believe his attraction to children would go away, but he could control himself if he stopped and considered the consequences of an action. He testified that, since he was a teenager, he would attempt to engage in window peeping three to four times every five or six months on a regular basis; that, over a six-year period, he touched his girlfriend's daughter sexually "close to 200 times"; and that his attraction to young females had "stayed pretty

3

much the same" since he was 10 or 11 years old. He stated that he still had sexual problems, but he did not "act on them as much as [he] used to."

The two court-appointed psychologists, Dr. Linda Marshall and Dr. Mary Kenning, submitted reports and testimony. Dr. Marshall gave her opinion that appellant met the threshold for commitment as SDP; Dr. Kenning gave her opinion that he did not meet that threshold.

Dr. Marshall administered the Minnesota Multiphasic Personality Inventory-2, which showed that appellant had clinical elevations in Axis I disorders relating to antisocial behavior, paranoia, and confused thinking. His scores on the Millon Clinical Multiaxial Inventory-III indicated that he had pervasive and enduring personality traits underlining his interpersonal difficulties. Dr. Marshall diagnosed appellant with Axis I disorders of pedophilia, voyeurism, a rule-out diagnosis of paraphilia, not otherwise specified, and histories of bipolar disorder, alcohol dependency, and cannabis abuse. She also diagnosed him with Axis II, borderline personality disorder, which she believed affected his judgment, his relationship difficulties, and the chaos in his life.

The results of the Minnesota Sex Offender Screening Tool-3.1 (MnSOST-3.1), given during appellant's end-of-confinement review, showed that he had a predicted probability of sexual recidivism of 4.36 percent, with a percentile rank of 79.40, placing appellant in the group of sex offenders with a moderate risk of committing another sex offense within four years. Appellant scored a seven on the Static-99R, an actuarial instrument that measures recidivism with static factors. Dr. Marshall testified that this score placed him in the group of sex offenders at high risk for being charged or convicted

of another sex offense. She also administered the Sexual Violence Risk-20 (SVR-20), an instrument that uses structured clinical judgment by assessing an organized list of risk factors found to correlate with a risk of sexual offenses. On the SVR-20, appellant scored 13 of 20 risk markers, placing him in the moderate-to-high-risk range for risk of sexual violence.

Dr. Marshall testified that, in evaluating appellant, she looked at "the big picture," including his test scores and interview. She testified that it was a "red flag" that he had engaged in window peeping after three years in treatment and that he should have been able to identify triggers and stop any sexually deviant behavior before it occurred. She indicated that appellant's difficulties in outpatient treatment validated her opinion that more secure treatment would be appropriate and that she was concerned for public safety, based on his lack of success in treatment and psychological instability.

Dr. Marshall opined that the *Linehan* factors supported appellant's commitment as an SDP.[2] She stated that his age of 37 did not significantly lower his risk to reoffend, that

---

[2] The supreme court has identified six factors to consider in determining whether a person is highly likely to engage in harmful sexual acts in the future, supporting that person's commitment as SDP. *In re Linehan*, 557 N.W.2d 171, 189 (Minn. 1996) (*Linehan III*), *vacated on other grounds,* 522 U.S. 1011, 118 S. Ct. 596 (1997), *aff'd on remand*, 594 N.W.2d 867 (Minn. 1999). These factors are:

> (a) the person's relevant demographic characteristics (*e.g.*, age, education, etc.); (b) the person's history of violent behavior (paying particular attention to recency, severity, and frequency of violent acts); (c) the base rate statistics for violent behavior among individuals of this person's background (*e.g.*, data showing the rate at which rapists recidivate, the correlation between age and criminal sexual activity,

his last offense was in 2011, and that he had a history of early dysfunction and problems. She noted his criminal sexual conduct convictions, including the offense involving a child over a six-year period. She reported that base-rate statistics suggest a high risk of appellant reoffending: that, under the MnSOST-3.1, which looks at both static and dynamic factors, he scored as a moderate risk to reoffend and that on the Static-99R, he scored as a high risk of reconviction. She indicated that his designation as a Level 3 sex offender and possible problems finding employment would create additional stress, and he would be returning to the area in which his offenses took place and living with his mother, which had not previously stopped him from offending. She pointed out that appellant has not completed treatment and engaged in voyeurism during treatment, and that she would not recommend additional outpatient treatment because he needs more structured treatment in an inpatient program.

Dr. Mary Kenning, the second court-appointed examiner, testified that appellant has had issues with deceitfulness, failure to conform to social norms, impulsivity, and reckless disregard for the safety of others; that ongoing characteristics of his personality disorder made treatment progress slow; and that his personality style required particular intervention. She opined that his disorders have affected his engaging in inappropriate

> etc.); (d) the sources of stress in the environment (cognitive and affective factors which indicate that the person may be predisposed to cope with stress in a violent or nonviolent manner); (e) the similarity of the present or future context to those contexts in which the person has used violence in the past; and (f) the person's record with respect to sex therapy programs.

*In re Linehan*, 518 N.W.2d 609, 614 (Minn. 1994) (*Linehan I*).

6

sexual activity, but that she "[did not] think he quite gets to highly likely" to engage in future harmful sexual conduct.

Dr. Kenning agreed with Dr. Marshall's assessment of appellant's risk of recidivism based on his scores on the MnSOST-3.1, the Static-99R, and the Hare Psychopathy Checklist-Revised (HARE-PCL-R), on which he scored in the moderate range. But Dr. Kenning also administered the Structured Risk Assessment-Forensic Version (SRA-FV), a dynamic risk-assessment measure that examines factors of an offender's sexual interest, relational style, and self-management. She testified that the SRA-FV "is more recent research that helps us understand additional factors that aren't part of the person's history" and "have to do with here and now." Dr. Kenning reported that appellant's score on the SRA-FV was associated with a moderate level of psychological or dynamic needs, which best matches with the norm group of people preselected for treatment need, and that this score would tend to moderate his score on the Static-99R. She opined that, within the group of persons who scored a seven on the Static-99R, appellant has a lower level of individual need and risk, suggesting a rate of recidivism of 25.4 percent within five years, 33 percent within ten years, and 50.8 percent over a lifetime.

Dr. Kenning also saw appellant's voyeurism as separate from his pedophilia. She testified that appellant had a better prognosis than a person solely attracted to children, and she did not believe his voyeurism was similar to that of offenders preparing for home invasion or stranger assault. She testified that appellant was amenable to treatment and she would endorse additional outpatient treatment. She believed that any concerns about

7

his ability to complete treatment within his five-year conditional-release period could be addressed. She testified that appellant's behavior was annoying, inappropriate, and to some extent invasive, but that he did not present a public safety risk unmanageable by intensive supervised release, ongoing treatment, and interventions such as medication.

Dr. Kenning also reported on the application of the *Linehan* factors. She opined that appellant's gender and socioeconomic status increased his risk of reoffense and noted his contact victims. She stated that "[i]nformation from current risk assessment measures indicates that [appellant's] risk of recidivism is somewhat higher than the base rates for the average offender." She reported appellant's past stress arising from the murder of his son, alcohol abuse, and sex-offender treatment. She noted that, although return to the community would be stressful, he would likely live with his mother and not seek employment. And she believed that appellant's progress in sex-offender treatment was appropriate, if slow.

Dr. Kenning also testified, however, that "we have newer and better data . . . now than *Linehan* reflects"; that demographic factors are subsumed in actuarial measures, such as the SRA-FV; and that some *Linehan* factors are now examined as part of an individual dynamic risk factor assessment. She testified that in the last few years, risk assessment has been discussed at the national level, and that some people had chosen not to use the SRA-FV because of a belief that it was not well-normed for use in commitment proceedings. She testified that she had received initial training on use of the SRA-FV during the last year and that she has probably used it only in about ten cases, but that

8

California legally mandates its use in all sex-offender assessments. She testified that the SVR-20 "did a good job of predicting risk," but that it was "not very common anymore."

The district court held an additional hearing on the issue of the psychologists' testing methods. At that hearing, the state's attorney told the district court that, he could "to a certain extent, stipulate" an answer to the district court's first question: whether the SRA-FV, used in conjunction with the Static-99R, is a valid testing technique. He stated that "[i]t certainly is appropriate that they can be used together. That's not the issue from the state's point of view." The following colloquy occurred:

> THE COURT: So what you're telling me is that, in essence, you're stipulating that the SRA-FV, used in conjunction with the Static-99R, is a valid testing technique. Is -- Did I miss --
>
> STATE'S ATTORNEY: Well, or it's a valid combination of the two to consider issues. That's how I would state it, but yes.
>
> THE COURT: Mr. Magnus, anything on that?
>
> APPELLANT'S ATTORNEY: No, your honor. I think that that is an accurate statement; that it's a -- commonly accepted tool for assessment of risk in these matters.
>
> . . . .
>
> THE COURT: Maybe that's a better terminology. It's an acceptable tool.
>
> STATE'S ATTORNEY: Certainly.

Dr. Marshall testified that it was acceptable practice to use the SRA-FV in conjunction with the Static-99R and she also had received training in its administration, but she would categorize the SRA-FV as "relatively new" and "not widely used" and she had come across only one person who was currently using it in court examinations. She

stated that she used the SVR-20 because she was familiar with it, and it examined both static and dynamic factors.

Dr. Marshall testified that, since she began performing court examinations in about 1995, more actuarial instruments have become available, including the MnSOST-3.1 and the Static-99R. She acknowledged that some portions of the SRA-FV relate to an inability to complete treatment and can predict a risk of recidivism. But she testified that she "would never make a recommendation for commitment based on an actuarial score. You really, really have to look at the complete picture . . . [t]he psychological testing was also very imperative . . . in my decision and it was important for me to look at how he was functioning psychologically." She testified that appellant's mental illness and personality disorder, as shown in her psychological testing, interfered with his ability to control his sexual urges. She stated that beyond actuarial determinations, she saw significant factors: appellant had not successfully completed treatment; had offended while he was in treatment; and had a history of psychological problems and alcohol use. Appellant's attorney declined to call Dr. Kenning for additional testimony.

The district court concluded that appellant met the standards for civil commitment as an SDP. The district court found that clear and convincing evidence existed that, as a result of his past course of harmful sexual conduct and his mental disorders, it was highly likely that he would engage in further harmful sexual conduct. The district court found that Dr. Kenning "noted that the SRA-FV is a new assessment measure, not yet widely used in Minnesota," and determined that Dr. Marshall's opinion on the likelihood of reoffense was credible and Dr. Kenning's opinion was not credible. The district court

10

found that appellant failed to present a less-restrictive program than the Minnesota Sex Offender Treatment Program (MSOP) to meet his needs and public-safety requirements and committed him to that program. Appellant filed this appeal, which was stayed pending the release of *In re Civil Commitment of Ince*, 847 N.W.2d 13 (Minn. 2014). Following *Ince,* this court dissolved the stay and reinstated the appeal.

## D E C I S I O N

This court reviews de novo whether clear and convincing evidence in the record supports the district court's conclusion that appellant meets the standards for commitment as an SDP. *In re Civil Commitment of Crosby*, 824 N.W.2d 351, 356 (Minn. App. 2013), *review denied* (Minn. Mar. 27, 2013). But we review a district court's factual findings for clear error. *In re Civil Commitment of Stone*, 711 N.W.2d 831, 836 (Minn. App. 2006), *review denied* (Minn. June 20, 2006). We view the record in the light most favorable to the district court's decision, recognizing that the district court is in the best position to assess and weigh the credibility of the witnesses. *See In re Civil Commitment of Navratil*, 799 N.W.2d 643, 647 (Minn. App. 2011), *review denied* (Minn. Aug. 24, 2011). "Where the findings of fact rest almost entirely on expert testimony, the [district] court's evaluation of credibility is of particular significance." *In re Knops*, 536 N.W.2d 616, 620 (Minn. 1995).

Commitment as an SDP requires that a person "(1) has engaged in a course of harmful sexual conduct . . . ; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct." Minn. Stat. § 253D.02, subd. 16. The Minnesota Supreme Court has

11

interpreted this standard to mean that the state must establish that the person is "highly likely [to] engage in harmful sexual acts in the future." *In re Linehan*, 594 N.W.2d 867, 876 (Minn. 1999) (*Linehan IV*). Information relevant to this issue includes evidence on the six *Linehan* factors. *See Linehan I*, 518 N.W.2d at 614 (stating *Linehan* factors). No single factor is determinative, and whether someone is highly likely to reoffend is a complex inquiry. *See Linehan III*, 557 N.W.2d at 189 (stating that "[s]tatistical evidence of recidivism is only one of the six factors" and "dangerousness prediction methodology is complex and contested").

A psychologist's specialized knowledge assists the trier of fact in assessing a person's psychological state, which is relevant to the criteria used to determine whether the person meets the legal standards for commitment as an SDP. *In re Civil Commitment of Jackson*, 658 N.W.2d 219, 227 (Minn. App. 2003), *review denied* (Minn. May 20, 2003). Appellant challenges the district court's finding that clear and convincing evidence exists that he is highly likely to engage in acts of harmful sexual conduct, based on the psychologists' expert testimony. He first argues that the district court clearly erred by finding that Dr. Kenning testified that the SRA-FV is a new assessment measure, which is not yet widely used in Minnesota. He points out that Dr. Kenning testified that the SRA-FV was not a new assessment, that Dr. Marshall testified that it was acceptable to use both the SRA-FV and the Static-99R, and that both experts indicated that the SRA-FV moderates the Static-99R in an attempt to make scoring more accurate. He also maintains that the district court's finding contradicts the parties' stipulation that the SRA-

FV, used in conjunction with the Static-99R, was a "commonly accepted tool for risk assessment."

We disagree with appellant's arguments. The district court properly conducted a second hearing to fully examine the psychologists' testing methods. *See In re Detention of Ritter*, 312 P.3d 723, 726 (Wash. Ct. App. 2013) (remanding for a district court hearing in a civil commitment proceeding to determine whether the SRA-FV satisfies the *Frye* test for admissibility of novel scientific evidence). Although appellant correctly states that Dr. Kenning testified that the SRA-FV has "been around for a fair amount of time," and is commonly used in California, Dr. Kenning also testified that the SRA-FV involved "more recent research[,]" and she has only used the SRA-FV in "probably about ten" cases. And Dr. Marshall characterized the SRA-FV as a "relatively new" instrument and testified that, in her work as a court examiner, she had encountered only one person using it. In addition, the record shows that the state's attorney did not stipulate that the SRA-FV was a "commonly acceptable tool," but only agreed that its use, in combination with the Static-99R, was valid in risk assessment. Thus, the district court's finding that the SRA-FV is a new test in Minnesota is supported by the record and is not clearly erroneous.

Appellant also argues that the district court clearly erred by relying on Dr. Marshall's use of the SVR-20, a structured-clinical-judgment measure, rather than Dr. Kenning's use of the SRA-FV. He maintains that, based on the record, actuarial assessments such as the SRA-FV are more accurate at predicting recidivism, noting that Dr. Marshall acknowledged that some factors in the SVR-20 are not predictive of risk

13

and that she used that instrument in part because she was familiar with it. But Dr. Marshall did not assess appellant's risk of recidivism based exclusively on the SVR-20; she also used actuarial instruments such as the Static-99R and the MnSOST-3.1. And significantly, she testified that she looked generally at "the complete picture," examining the results of appellant's interview and psychological testing to evaluate how he was functioning. Based on this record, the district court did not clearly err by crediting Dr. Marshall's opinion and finding that the evidence supported a determination that appellant was highly likely to reoffend.

*Application of Ince*

Appellant argues that the district court's commitment decision is inconsistent with the Minnesota Supreme Court's recent decision in *Ince*. In *Ince*, the supreme court reaffirmed the "highly likely" standard in determining whether a person is likely to engage in future acts of harmful sexual conduct. *Ince*, 847 N.W.2d at 21. The supreme court rejected the argument that the *Linehan* factors had been displaced by a recent emphasis on actuarial assessment, stating that "the need for a multi-factor analysis lies in the very purpose for civil commitment," and the district court remains in the best position to evaluate the evidence, including expert-witness credibility. *Id.* at 22–24. The supreme court recognized the relevance of actuarial assessment evidence, but it cautioned against "potential factor repetition that can result from considering the *Linehan* factors in addition to multiple actuarial assessments that use different approaches based on factors that are the same as or similar to the *Linehan* factors." *Id.* at 24. The supreme court remanded the case for additional findings because the district court had "simply reviewed

14

the *Linehan* factors after largely accepting [an expert's] opinion[] on the actuarial evidence [and did not] indicat[e] the significance of any of those factors within the context of a multi-factor analysis." *Id.*

Appellant argues that, based on *Ince*, the district court's findings and analysis are clearly erroneous because it engaged in factor repetition by considering the same evidence in assessing the *Linehan* factors as it did in examining the actuarial testing results. He maintains that the district court could have avoided this repetition by crediting Dr. Kenning's opinion because she used the SRA-FV in conjunction with the Static-99R, which provided a more complete and accurate picture of appellant's risk level based on actuarial assessment.

We reject this argument for two reasons. First, this case is factually dissimilar to *Ince*, in which the supreme court stated that the experts' opinions provided "mixed, if not contradictory, results based on the actuarial evidence as compared to the *Linehan* factors." *Id.* The supreme court noted the "difficult task the [district] court faced in this unique case" and determined that "the unusual nature of the facts and circumstances" required a remand. *Id.* at 25, 26. In contrast, in this case, although Dr. Marshall and Dr. Kenning disagreed on appellant's risk to reoffend, Dr. Marshall's evaluation of that risk based on her test results and interview was not inconsistent with her application of the *Linehan* factors.

Second, in *Ince*, the supreme court stated that it "[could] not determine whether the district court adhered to the *Linehan* factors," *id.* at 25; but here, the district court specifically addressed and made findings on the *Linehan* factors. For instance, the

15

district court found, with respect to the second *Linehan* factor, the history of violent behavior, that "Dr. Kenning's focus on [appellant's] last two offenses as 'non-violent sexual offenses' ignores the fact that these offenses occurred while [he] was under release conditions, subject to probationary supervision and involved in intensive outpatient sex offender treatment." And with respect to the sixth *Linehan* factor, a person's record with respect to sex therapy programs, the district court found that appellant had not completed sex-offender treatment and most recently offended after several years in outpatient treatment. Thus, the district court's findings reflect its independent review of the record and its correct application of the applicable legal standard as articulated in *Ince*.

Appellant acknowledges that, by contending that the district court should have credited Dr. Kenning's opinion, he supports a policy argument that the *Linehan* factors should be replaced by actuarial tools like the SRA-FV, because the factors are now represented in the actuarial measurements. But the supreme court in *Ince* expressly considered and rejected that argument, reiterating the *Linehan* factors as part of the multi-factorial analysis used to evaluate whether a person is highly likely to reoffend. *Id.* at 26. Viewing the record in the light most favorable to the district court's decision, clear and convincing evidence supports the determination that appellant is highly likely to engage in further harmful sexual conduct and that he meets the criteria for commitment as an SDP.

*Less-restrictive alternative*

Appellant also argues, based on *Ince*, that the record does not support the district court's conclusion that he failed to show the availability of a less-restrictive treatment

16

program meeting his needs and public-safety requirements. *See* Minn. Stat. § 253D.07, subd. 3 (Supp. 2013) (stating that if the requirements for committing a person as an SDP are met, the district court "shall commit the person to a secure treatment facility unless the person establishes by clear and convincing evidence that a less restrictive treatment program is available . . . consistent with the person's treatment needs and the requirements of public safety"). In *Ince*, the supreme court concluded that the district court had made insufficient findings for meaningful appellate review on the issue of a less-restrictive alternative and ordered additional findings on remand. *Ince*, 847 N.W.2d at 26.

Appellant argues that the district court failed to make particularized findings on how his proposed less-restrictive alternative—living at home with his mother and attending treatment at the Safety Center—would not serve his needs and meet public-safety requirements. He points out that he presented evidence that, as a Level 3 sex offender, if released from custody, he would be placed on intensive supervised release (ISR), which would provide more supervision than his previous probation conditions. But the district court found that, under appellant's proposed plan, he would "return[] . . . to the same community and the same situation in which he was living at the time of his last criminal offense and his multiple probation and treatment violations." The district court also found that, after a short period of time, appellant would be subject to the same conditions and terms as during his probation, and that the Safety Center could not provide appropriate treatment because it failed him when he reoffended after three-and-one-half years in the program. These findings are not clearly erroneous, and they sufficiently

17

support the district court's determination that appellant has failed to establish by clear and convincing evidence that a less-restrictive program is available that would meet his present needs and public-safety requirements.

**Affirmed.**