In the Matter of the CIVIL COMMITMENT OF Gary R. JANCKILA.

No. C3–02–2060.

Court of Appeals of Minnesota.

March 18, 2003.

Robert W. Adams, Buffalo, MN, for appellant Gary R. Janckila.

Thomas N. Kelly, Wright County Attorney, Terry D. Frazier, Assistant County Attorney, Buffalo, MN, for respondent.

Considered and decided by HARTEN, Presiding Judge, PETERSON, Judge, and HALBROOKS, Judge.

## OPINION

HARTEN, Judge.

Appellant challenges his commitment as mentally ill and the order authorizing involuntary administration of neuroleptic medication, arguing that there was not clear and convincing evidence that he posed a substantial likelihood of physical harm to himself or others and that the finding that he lacked the capacity to refuse neuroleptic medication was clearly erroneous. We affirm.

## FACTS

In March 2002, appellant Gary Janckila was charged with criminal damage to property after he complained that he heard noises in a wall of his father's house and punched holes in the wall. In September 2002, he was charged with felony criminal damage to property after punching or kicking several holes in the walls of a motel room. The police found a loaded handgun in the trunk of appellant's car and a notebook in the motel room. The police reported that the notebook contained

> numerous accounts of police officers seen by [appellant] in the last year, * * * accounts of people who looked at him and the vehicle[s] in which they were driving including directions and license plates, [and] journal entries of waking up in the middle of the night hearing strange noises coming from the walls [and] coming from his mouth.

Appellant was hospitalized for evaluation. After he refused to cooperate or to take medication, a physician at the hospital initiated the commitment process.

At the commitment hearing, appellant testified that he heard noises at each of the nine motels he had lived in during the past couple of years and that the police had been harassing him since 1998. When asked why he punched holes in his father's wall, appellant testified that he was trying to determine the source of the noise.

The court-appointed examiner, James Alsdurf, Ph.D., testified that appellant "admitted to hearing sounds that he believed were directed toward him that caused him to feel uneasy, uncertain, anxious and concerned about his safety." When asked whether appellant might be a danger to himself or others, Dr. Alsdurf testified that

> there's no one specific behavior that would indicate that he represents a danger to himself or others. I think it is more the combination of factors that would include things like * * * punch[ing] holes in walls at his father's home [and] at the motel room. He [has] allegedly—reportedly confronted people in different settings, including his father and strangers, * * * trying to find the source of this noise. So I think he engages in provocative behavior that really could cause danger to him[, b]ecause I don't think he recognizes that people perceive his behavior as threatening toward them.

Dr. Alsdurf diagnosed appellant with delusional disorder and recommended that the district court commit him as mentally ill. The district court ordered that appellant be committed to the Willmar Regional Treatment Center (Willmar RTC).

After appellant refused neuroleptic medication at the Willmar RTC, his treating physician petitioned the district court for an order authorizing the administration of the medication. At the Jarvis hearing, both the treating physician and a court-appointed psychiatrist testified that neuro-

leptic medication was clinically indicated and that appellant did not have the capacity to make decisions regarding the use of neuroleptics in his treatment. The district court authorized the administration of the medication.

Appellant challenges both the order of commitment and the order authorizing the administration of neuroleptic medication.

## ISSUES

1. Was there clear and convincing evidence that appellant posed a substantial likelihood of physical harm to himself or others?

2. Was the district court's finding that appellant lacked the capacity to refuse neuroleptic medication clearly erroneous?

## ANALYSIS

### 1. Substantial Likelihood of Harm

 In reviewing a commitment, we are limited to an examination of whether the district court complied with the requirements of the commitment act. *In re Schaefer*, 498 N.W.2d 298, 300 (Minn.App. 1993). An appellate court will not reverse a district court's findings of fact unless they are clearly erroneous. *In re McGaughey*, 536 N.W.2d 621, 623 (Minn.1995). There must be clear and convincing evidence that a person is mentally ill in order to commit that person. Minn.Stat. § 253B.09, subd. 1(a) (2002). We review de novo the question of whether the evidence is sufficient to meet the standard of commitment. *In re Knops*, 536 N.W.2d 616, 620 (Minn.1995).

A "person who is mentally ill" is one who has a substantial psychiatric disorder that "poses a substantial likelihood of physical harm to self or others." Minn Stat. § 253B.02, subd. 13(a) (2002). A substantial likelihood of harm may be demonstrated by

(1) a failure to obtain necessary food, clothing, shelter, or medical care as a result of the impairment;

(2) an inability for reasons other indigence to obtain necessary food, clothing, shelter, or medical care as a result of the impairment and it is more probable than not that the person will suffer substantial harm, significant psychiatric deterioration or debilitation, or serious illness, unless appropriate treatment and services are provided;

(3) a recent attempt or threat to physically harm self or others; or

(4) recent and volitional conduct involving significant damage to substantial property.

*Id.* [1]

The district court made a number of findings demonstrating that appellant posed a substantial likelihood of harm. It found that appellant was paranoid, that he believed he was under surveillance by the police, that he kept a detailed log of individuals who he believed were watching him, and that he had a loaded handgun in his car. *See* Minn.Stat. § 253B.02, subd. 13(a)(3) (likelihood of harm shown by threats or attempts to harm self or others); *In re Martin*, 458 N.W.2d 700, 704–05 (Minn.App.1990) (finding likelihood of harm by threatening, paranoid, and pro-

---

**1.** The provision concerning significant damage to substantial property was added in 2001. 2001 Minn. Laws 1st Spec. Sess. ch. 9, art. 9, § 21. The application of the provision is before this court for the first time.

vocative behavior). The district court also found that appellant was homeless, staying in nine different motels in previous months, and that he resisted treatment for his disorder. *See* Minn.Stat. § 253B.02, subd. 13(a)(1) (likelihood of harm shown by failure to obtain shelter or medical care). Finally, the district court found that appellant had significantly damaged walls at both his father's home and a motel room. *See id.,* subd. 13(a)(4) (likelihood of harm shown by recent and volitional conduct involving significant damage to substantial property).

Appellant does not challenge these findings, but he argues that they fail to demonstrate that he posed a substantial likelihood of physical harm to himself or others. Appellant focuses his challenge on Minn. Stat. § 253B.02, subd. 13(a)(4). Although we recognize that the district court did not base its determination solely on that provision, we nevertheless address the merits of appellant's argument.

■ Under the statute, conduct involving significant damage to substantial property may demonstrate that a person poses a substantial likelihood of physical harm to self or others. *Id.* The statute does not define "significant damage to substantial property." Terms in a statute that are not explicitly defined must be construed "according to their common and approved usage." Minn.Stat. § 645.08(1) (2002). We conclude that punching or kicking eight or nine holes—one measuring two feet by three feet—in a motel room wall is conduct involving significant damage to substantial property.

Appellant questions how damaging walls demonstrates a substantial likelihood of physical harm. But appellant could certainly harm himself by punching holes in

walls. Moreover, the record indicates that appellant's behavior resulted in confrontations with third persons that could escalate into physical altercations. Appellant testified that his "bang[ing] on the walls * * * led to some discussions with other tenants in the motel"; the pre-petition screening report indicated that appellant had "confronted strangers in adjoining motel rooms in the middle of the night thinking that they were somehow threatening him through the stud walls," and Dr. Alsdurf testified that appellant does not recognize that others perceive his behavior as threatening.

We conclude that there was clear and convincing evidence that appellant posed a substantial likelihood of physical harm to himself or others.

## 2. Administration of Neuroleptic Medication

■ Appellant argues that the district court's finding that he lacked the capacity to make decisions regarding neuroleptic medication was clearly erroneous.

A patient is presumed capable of deciding whether to take neuroleptic medication. Minn.Stat. § 253B.092, subd. 5(a) (2002). But if the court finds that a patient who refuses neuroleptic medication lacks the capacity to decide whether to take the medication, the court may authorize the treating facility to administer the medication. *Id.,* subd. 8 (2002). When determining if a patient has the capacity to make decisions regarding neuroleptic medication, the district court must consider the following:

(1) whether the person demonstrates an awareness of the nature of the person's situation, including the reasons for hospitalization, and the possible conse-

quences of refusing treatment with neuroleptic medications;

(2) whether the person demonstrates an understanding of treatment with neuroleptic medications and the risks, benefits, and alternatives; and

(3) whether the person communicates verbally or nonverbally a clear choice regarding treatment with neuroleptic medications that is a reasoned one not based on delusion, even though it may not be in the person's best interests.

*Id.*, subd. 5(b) (2002).

█ The record supports the district court's finding that appellant lacked the capacity to make decisions regarding the administration of neuroleptic medication. Three mental health professionals testified that neuroleptic medication was clinically indicated and that appellant did not have the capacity to decide whether to take the medication. Specifically, Dr. Alsdurf testified that appellant's entrenched delusional thinking prevented him from considering the effectiveness, appropriateness, and benefits of neuroleptic medication. Appellant's treating physician testified that appellant did "not understand his personal situations, the reasons for hospitalization, and the consequences of refusing neurolep-

tic medications." When the findings of fact rest almost entirely on expert testimony, the district court's evaluation of credibility is particularly significant. *Knops,* 536 N.W.2d at 620. We conclude that the district court's finding that appellant lacked the capacity to refuse neuroleptic medication was not clearly erroneous.

## DECISION

We conclude that there was clear and convincing evidence that appellant posed a substantial likelihood of harm to himself or others and that the district court's finding that appellant lacked the capacity to refuse neuroleptic medication was not clearly erroneous.

**Affirmed.**