*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0276**

In the Matter of the Civil Commitment of:
Andrew Nordstrom.

**Filed August 4, 2014
Affirmed
Willis, Judge***

Hennepin County District Court
File No. 27-MH-PR-13-1236

Kurt M. Anderson, Minneapolis, Minnesota (for appellant)

Michael O. Freeman, Hennepin County Attorney, John L. Kirwin, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Considered and decided by Ross, Presiding Judge; Larkin, Judge; and Willis, Judge.

**U N P U B L I S H E D   O P I N I O N**

**WILLIS**, Judge

Appellant challenges his commitment as a mentally ill person, arguing that the evidence is insufficient to conclude that he meets the criteria for civil commitment and

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

that the district court erred by granting the petition to forcibly administer neuroleptic medication. We affirm.

## FACTS

On November 27, 2013, appellant Andrew Nordstrom was hospitalized at the Fairview Riverside campus of the University of Minnesota Medical Center (FRMC). At the time, Nordstrom was living at his parents' home and had recently lost his job. His mother, a registered nurse, and his father, a cardiologist, noted that Nordstrom was acting in a paranoid manner, making nonsensical statements, and engaging in erratic behavior. On November 27, they discovered him in the basement destroying a snowboard with a hammer. His parents called the police because Nordstrom's behavior made them concerned for his mental health and for their own safety. Two police officers arrived and were directed to the basement. Nordstrom did not reply to the police when they announced their presence and attempted to rush past the officers on the stairs. One officer tackled Nordstrom. Nordstrom struggled, and in the scuffle, the officer's knife fell from his vest. Nordstrom grabbed for the knife but was unable to reach it. He later testified that he owns a knife and thought that it was his knife that fell. The officers eventually subdued and handcuffed Nordstrom. The officers took Nordstrom to the hospital for psychiatric evaluation, and FRMC placed him on medical hold. FRMC staff observed that Nordstrom was suspicious, fearful, and guarded. Nordstrom engaged in rambling and disjointed speech, and he did not eat or take much fluid for the first several days he was at the hospital.

2

Nordstrom had a history of prior incidents that caused his parents to be concerned about his mental health. In 1995, Nordstrom was hospitalized for psychiatric problems. During that time, his parents described him as "psychotic," and he told his mother "[j]ust kill me." His situation improved after taking neuroleptic medication. He was hospitalized again in 2001 or 2002 for psychiatric treatment. In November 2012, Nordstrom pulled out a knife and showed it to his father, saying, "This is my protection." Sometime in 2013, he told his mother, "You guys are making me a killer." Nordstrom's parents attempted to convince him to take neuroleptic medication; he sometimes agreed to take medication but stopped when he began to return to normal.

After being hospitalized at FRMC for approximately a week, Nordstrom started to take neuroleptic medication. But he did not believe he needed the medication or that he had any mental illness. FRMC petitioned the district court to commit Nordstrom as a person who is mentally ill and to authorize the forcible administration of neuroleptic medication. The district court appointed Dr. Patricia Aletky as an independent examiner, and took judicial notice of her report, in which she diagnosed Nordstrom with schizophrenia and a major mood disorder in the nature of major depression. The district court concluded that Nordstrom met the statutory criteria for civil commitment and required commitment as a mentally ill person. In a separate order, the district court concluded that Nordstrom lacked the capacity to make an informed decision about the administration of neuroleptic medication, that treating his mental illness with neuroleptic medication is necessary and reasonable, and that the benefits of neuroleptic medication

3

outweigh the risks from that treatment and justify forcible administration. This appeal follows.

**D E C I S I O N**

**I.     The evidence is sufficient to support the district court's finding that Nordstrom is a mentally ill person.**

Nordstrom argues that the facts in this case are insufficient to prove mental illness by clear-and-convincing evidence. Our review of a district court's decision to commit an individual as mentally ill is limited to consideration of whether the district court complied with the requirements of the Minnesota Commitment & Treatment Act. *In re Civil Commitment of Janckila*, 657 N.W.2d 899, 902 (Minn. App. 2003). We do not reverse the district court's factual findings unless they are clearly erroneous, giving due regard to the district court's credibility assessments. *In re Thulin*, 660 N.W.2d 140, 144 (Minn. App. 2003). We review de novo whether clear-and-convincing evidence supports the district court's conclusion that a person meets the standards for commitment. Minn. Stat. § 253B.09, subd. 1(a) (2012); *Janckila*, 657 N.W.2d at 902.

A district court "shall commit" a person if it "finds by clear and convincing evidence that the proposed patient is a person who is mentally ill." Minn. Stat. § 253B.09, subd. 1(a). The statute defines "person who is mentally ill" as a person who

> has an organic disorder of the brain or a substantial psychiatric disorder of thought, mood, perception, orientation, or memory . . . which is manifested by instances of grossly disturbed behavior or faulty perceptions and [who] poses a substantial likelihood of physical harm to self or others as demonstrated by:

4

> (1) a failure to obtain necessary food, clothing, shelter, or medical care as a result of the impairment;
>
> . . .
>
> (3) a recent attempt or threat to physically harm self or others; or
>
> . . . .

Minn. Stat. § 253B.02, subd. 13(a) (2012).

**Mental Illness**

Dr. Aletky diagnosed Nordstrom with schizophrenia and her report indicates paranoid schizophrenia as an additional diagnosis to rule out. She concluded that Nordstrom suffered from a substantial psychiatric disorder of thought and mood; that it grossly impaired his judgment, behavior, and capacity to reason or understand; and that it was manifested by instances of grossly disturbed behavior or faulty perceptions. Nordstrom argues that this diagnosis is insufficient to prove mental illness. He asserts that Dr. Aletky's diagnosis is tentative because she listed paranoid schizophrenia as an additional diagnosis to rule out. Nordstrom defines "rule out" as a diagnosis that should be considered further because the client meets many of the symptoms, but not enough to make a diagnosis at the time in question.

We are not persuaded. Dr. Aletky's indication that paranoid schizophrenia might be a more specific diagnosis does not negate her conclusion that Nordstrom suffers from schizophrenia. Given the complex nature of commitment proceedings, which require assessments and evaluations by experts, a diagnosis need not be stated with exact certainty as long as the disorder meets the standard for commitment. *See In re Civil*

*Commitment of Navratil*, 799 N.W.2d 643, 648 (Minn. App. 2011) (rejecting argument that "not otherwise specified" designation in diagnosis in that case did not mean that it was "less of a disorder"), *review denied* (Minn. Aug. 24, 2011); *see also In re Civil Commitment of Ince*, 847 N.W.2d 13, 21 (Minn. 2014) (explaining that "the distinct nature of commitment proceedings, with a focus on assessments and evaluations that require interpretation by experts, does not fit well with a demand for substantial certainty"). And the statute does not require a particular specific diagnosis in order to commit a person as mentally ill. *See* Minn. Stat. § 253B.02, subd. 13(a).

Because Nordstrom's argument that he is not a mentally ill person is based on the way the diagnosis is described in the report and order, and not the facts underlying the diagnosis, the evidence considered by the district court was sufficient to find that Nordstrom was a mentally ill person by clear-and-convincing evidence.

**Likelihood of harm to self or others**

Nordstrom argues that whether he poses a substantial likelihood of physical harm to self or others is speculative. The statute requires that the substantial likelihood of physical harm must be demonstrated by a failure to obtain necessary food, clothing, shelter, or medical care, or by an attempt or threat to harm self or others. Minn. Stat. § 253B.02, subd. 13(a). Speculation regarding whether the person may in the future cause physical harm is not sufficient to justify commitment as a mentally ill person. *In re McGaughey*, 536 N.W.2d 621, 623 (Minn. 1995). But it is not necessary that "the person must either come to harm or harm others before commitment as a mentally ill person is

6

justified"; "[t]he statute requires only that a substantial likelihood of physical harm exists, as demonstrated by an overt failure to obtain necessary food, clothing, shelter, or medical care or by a recent attempt or threat to harm self or others." *Id.* at 623–24.

The district court's finding that Nordstrom poses a substantial risk of harming himself or others is not clearly erroneous. The district court found that Nordstrom's mental illness has "driven him to violence" and that there is a substantial likelihood he will again engage in behaviors that will cause physical harm to himself or others. The district court's findings are supported by the record. Nordstrom was hospitalized because he was violently destroying a snowboard and engaged in inherently dangerous behavior when he grabbed for the police officer's knife. Nordstrom's action could have triggered a deadly response from the officer. *See In re Gonzalez*, 456 N.W.2d 724, 729 (Minn. App. 1990) (affirming commitment because appellant posed "a likelihood of harm to himself by his conduct which may outrage others and result in attack on him"); *see also In re Martin*, 458 N.W.2d 700, 704-05 (Minn. App. 1990) (finding substantial likelihood of harm to self or others when appellant became threatening while in a paranoid state and was easily provoked, and his behavior would likely present a threat in the community). Dr. Aletky's report concludes that Nordstrom had made a then-recent attempt or threat to physically harm himself or others as a result of his impairment based on the incident with the police and knife, and she noted that Nordstrom denies that the incident occurred at all.

Nordstrom's commitment is further supported by record evidence that he failed to obtain necessary food as a result of his impairment. Nordstrom refused to eat and was

taking in only small amounts of fluids when he was first at the hospital, as a result of his psychotic symptoms and extensive paranoia. And he told hospital staff that he did not need to eat because he was not burning any calories in the hospital, he was too tired, he was not hungry, the hospital meals were too "rich," and he needed to eat only one meal a day. He returned uneaten trays of food and told staff it was good or that he had eaten it.

Dr. Aletky's report concludes that Nordstrom failed to obtain necessary food, clothing, shelter, or medical care as a result of his impairment. His refusal to eat at the hospital resulting from his mental condition constitutes an "overt failure to obtain necessary food." *See McGaughey*, 536 N.W.2d at 623; *In re Anderson*, 367 N.W.2d 107, 108–09 (Minn. App. 1985) (affirming commitment where schizophrenic patient refused to eat properly and lost substantial weight even though "his condition was not yet life-threatening").

The district court's findings of fact are not clearly erroneous, and the evidence that Nordstrom is mentally ill and engaged in behavior that put him or others at risk of physical harm is sufficient to civilly commit him.

**II.   The district court did not err by granting the petition to forcibly administer neuroleptic medication.**

As an alternative argument, Nordstrom asserts that the district court erroneously granted the petition to forcibly administer neuroleptic medication, claiming that he does not lack the capacity to make medication decisions and that a reasonable person would not accept neuroleptic medication under the circumstances.

A court order is required for the administration of neuroleptic medications if a patient refuses to consent to treatment. Minn. Stat. § 253B.092, subd. 8(a) (2012). A person is presumed to have the capacity to consent to the administration of neuroleptic medication. Minn. Stat. § 253B.092, subd. 5(a) (2012). But a district court may authorize the involuntary administration of such medication if the court applies the following statutory factors and determines that the person lacks capacity to consent:

> (1) whether the person demonstrates an awareness of the nature of the person's situation, including the reasons for hospitalization, and the possible consequences of refusing treatment with neuroleptic medications;
>
> (2) whether the person demonstrates an understanding of treatment with neuroleptic medications and the risks, benefits, and alternatives; and
>
> (3) whether the person communicates verbally or nonverbally a clear choice regarding treatment with neuroleptic medications that is a reasoned one not based on delusion, even though it may not be in the person's best interests.

Minn. Stat. § 253B.092, subds. 5(b), 8(e) (2012). Disagreement with a physician regarding the use of neuroleptic medications is not evidence of an unreasonable decision. *Id.*, subd. 5(b). But if the court finds that the patient lacks the capacity to decide whether to take neuroleptic medication, the court may authorize the treating facility to administer the medication involuntarily. Minn. Stat. § 253B.092, subds. 7, 8(e) (2012). The person seeking to administer the medication has the burden of proving by a preponderance of the evidence that the patient lacks capacity to decide whether to take neuroleptic medication. Minn. Stat. § 253B.092, subd. 6(d) (2012); *Jarvis v. Levine*, 418 N.W.2d 139, 148 n.7

9

(Minn. 1988). If the person lacks the capacity to make decisions about whether to take neuroleptic medication, the court's decision must be based on what a reasonable person would do, taking into consideration:

> (1) the person's family, community, moral, religious, and social values;
> (2) the medical risks, benefits, and alternatives to the proposed treatment;
> (3) past efficacy and any extenuating circumstances of past use of neuroleptic medications; and
> (4) any other relevant factors.

Minn. Stat. § 253B.092, subd. 7(c).

Nordstrom argues that he does not lack the capacity to make decisions regarding the administration of medication. The record supports the district court's finding that Nordstrom lacked that capacity. First, the record shows that Nordstrom was unaware of his situation and the reasons for his hospitalization. At trial, he stated, "I believe I suffer from depression" and further explained, "Well, I think I suffer from seasonal affective disorder which is more of a sunlight type of thing." He disagreed that he has a "thinking disorder." He also stated that he did not need medication for a disorder. Dr. Aletky testified that Nordstrom lacks the capacity to make medication decisions because he is not competent, lacks insight into his condition, and has a "significant degree of paranoia."

Second, Nordstrom argues he has an understanding of treatment because of his parents' experience in the medical field and his past use of neuroleptic medications. But Nordstrom has not demonstrated that he understands the benefits associated with neuroleptic medication. Nordstrom has refused to address his mental illness with health

10

professionals and thus is not open to discussing the possibilities of medication, and the district court found there is "nothing in the record that would lead one to believe that [Nordstrom's] attitude toward psychiatric treatment will change anytime soon." He has refused medication in the past and when he does take medication, he stops doing so once he improves. He testified that he did not believe the treatment at the hospital has been beneficial for him.

Finally, Nordstrom cites his eventual acceptance of some food, fluids, and trial administration of medication as evidence of his capacity. But Nordstrom's testimony presented conflicting statements about medication: he first stated that he would not voluntarily take medication, but when his mother testified that he could not move home unless he did so, he testified that he would take medication. We defer to the district court's credibility findings, and it did not credit Nordstrom's expressions of willingness to take neuroleptic medication. The record supports the district court's determination that Nordstrom lacks the capacity to make decisions regarding the administration of neuroleptic medication because he lacks awareness of his situation; he does not show an understanding of the risks, benefits, or alternatives to neuroleptic medication; and he does not communicate a clear-and-reasoned choice regarding treatment with medications.

The district court also addressed the factors that a reasonable person would consider in deciding whether to take neuroleptic medication. Nordstrom offered no moral or religious reasons for his refusal, and he has experienced no known significant side effects from his past use of neuroleptic medications. The district court considered

the risks and benefits to neuroleptic medication and found that the benefits to Nordstrom outweigh the risks. Because the district court applied the proper standards, and clear-and-convincing evidence supports its decision, the district court's order authorizing the forcible administration of neuroleptic medication was not erroneous.

**Affirmed.**