*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0635**

In the Matter of the Civil Commitment of: Kenneth Melvin Shue, Jr.

**Filed September 29, 2014
Affirmed
Schellhas, Judge**

Nobles County District Court
File No. 53-PR-13-490

Robert L. Gjorvad, Runchey, Louwagie & Wellman, P.L.L.P., Marshall, Minnesota (for appellant Kenneth Melvin Shue, Jr.)

Lori Swanson, Attorney General, John D. Gross, Assistant Attorney General, St. Paul, Minnesota; and

Kathleen Kusz, Nobles County Attorney, Worthington, Minnesota (for respondent Nobles County)

Considered and decided by Peterson, Presiding Judge; Schellhas, Judge; and Klaphake, Judge.[*]

**U N P U B L I S H E D   O P I N I O N**

**SCHELLHAS**, Judge

Appellant challenges his indeterminate commitment as a sexual psychopathic personality and a sexually dangerous person, raising evidentiary issues and arguing that the evidence is insufficient to support his commitment. We affirm.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**FACTS**

Respondent Nobles County petitioned to commit appellant Kenneth Shue, Jr. as a sexually dangerous person (SDP) and a sexual psychopathic personality (SPP). For Shue's examination, the district court appointed Drs. Penny Zwecker and Robert Riedel, the latter at Shue's request. The county retained Dr. James Gilbertson as an expert examiner. At trial, Drs. Zwecker, Riedel, and Gilbertson testified, as did Shue's intensive supervised release (ISR) agent, Brett Serreyn; Shue's friend, Larry Lupkes; and two of Shue's victims, J.B. and A.P. Shue did not waive his marital privilege, thereby preventing the county from calling his wife, C.S., to testify. After the trial concluded but before the district court ruled, the county moved to reopen the record based on Shue's posttrial behavior. The district court granted the motion and subsequently also granted the county's motion to excuse Shue from the hearing because of his violent behavior.

At the hearing to reopen the record, the district court received additional documentary evidence and subsequently concluded that Shue met the criteria for commitment as an SDP and SPP and indeterminately committed him to the Minnesota Sex Offender Program (MSOP).

This appeal follows.

**D E C I S I O N**

*Evidentiary Issues*

Minnesota's commitment act provides that "[t]he court shall admit all relevant evidence at the hearing" and "shall make its determination upon the entire record pursuant to the Rules of Evidence." Minn. Stat. § 253B.08, subd. 7 (2012). In civil

commitment proceedings, a set of special rules supersedes any other rules which conflict with the special rules. Minn. Spec. R. Commit. & Treat. Act 1(a), (b). With respect to evidence, "[t]he court may admit all relevant, reliable evidence, including but not limited to the respondent's medical records, without requiring foundation witnesses." *Id.* at 15.

*Shue's Marital Privilege*

As explained below, Shue argues that the district court violated his marital privilege by relying on information from C.S.'s statements and past testimony in its commitment order. "The availability of a privilege established under statutory or common law is an evidentiary ruling to be determined by the [district] court and reviewed based on an abuse of discretion standard." *State v. Gianakos*, 644 N.W.2d 409, 415 (Minn. 2002). "The determination whether a particular testimonial privilege or exception exists, however, is a question of law [that an appellate] court reviews de novo." *Id.*

The marital-privilege statute provides:

> A husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent, nor can either, during the marriage or afterwards, without the consent of the other, be examined as to any communication made by one to the other during the marriage.

Minn. Stat. § 595.02, subd. 1(a) (Supp. 2013).

> The statute has two distinct privileges: (1) the privilege to prevent one spouse from testifying against the other during their marriage (the marital testimony privilege); and (2) the privilege to prevent one spouse from testifying at any time, during the marriage or after, concerning confidential interspousal communications during the marriage (the marital communications privilege).

3

*State v. Zais*, 805 N.W.2d 32, 37 n.1 (Minn. 2011) (quotations omitted).

Shue invoked his marital privilege before the commencement of trial, objecting to C.S.'s testimony at trial and the admission of C.S.'s statements and testimony about three past incidents involving Shue, as contained in exhibits 6 and 9. The district court precluded the county from calling C.S. as a witness but received exhibits 6 and 9, subject to Shue's objection. The court did not rule on Shue's objection at that time.[1] And, after trial, without expressly ruling on Shue's objection, the court relied on information from exhibits 6 and 9 in its commitment order.

In paragraph 45 of the commitment order, the district court mentioned information from C.S.'s prior testimony and her police interviews in connection with Shue's criminal proceeding that involved J.P. In the criminal proceeding that involved J.P., Shue did not assert his marital privilege to prevent C.S. from testifying. In paragraph 76 of the order, the court mentioned information from C.S.'s prior testimony and her police interviews in connection with Shue's criminal proceeding that involved L.J. In the criminal proceeding that involved L.J., Shue did not assert his marital privilege to prevent C.S. from testifying. In paragraphs 183 and 184 of the order, the court mentioned information from police interviews with C.S. in connection with an uncharged incident involving Shue and Y.G.G.

---

[1] The transcript reflects that Shue's attorney stated that he would submit a memorandum at the end of the case to address Shue's marital-privilege objection. The district court noted that it would make a ruling on whether it would consider the objected-to exhibits "following the filing of memorandum by counsel but [would] not consider those items until such time as a ruling has been issued." The parties did submit memoranda on this issue following trial.

Regarding the admission of C.S.'s past testimony at Shue's commitment trial, Shue waived his marital privilege by failing to assert his marital privilege or object to C.S.'s testimony in the prior trials. *See State v. Clark*, 296 N.W.2d 372, 376 (Minn. 1980) ("Since the defendant waived the privilege in the prior proceeding by failing to object, and the information was made public, there remains no 'confidence' to protect no[r] purpose to serve by exclusion of the same evidence in the current proceeding."). C.S.'s police-interview statements were not testimony and did not reveal confidential interspousal communications and therefore are outside of the scope of the marital privilege. *See State v. Schifsky*, 243 Minn. 533, 539–40, 69 N.W.2d 89, 93–94 (1955) (holding that admission of testimony by officers concerning wife's statements to them did not violate section 595.02). We conclude that the district court did not abuse its discretion by relying on C.S.'s past testimony and statements contained in exhibits 6 and 9, thereby implicitly overruling Shue's objection.

*Reopening the Trial Record*

Shue argues that the district court erred by reopening the trial record under Minn. R. Civ. P. 59.01, which provides that "[a] new trial may be granted to all or any of the parties and on all or part of the issues for any of the following causes: . . . (d) [m]aterial evidence newly discovered, which with reasonable diligence could not have been found and produced at the trial." He maintains that the county's rule 59.01(d) motion was premature because the court had not yet filed its February 24, 2014 commitment order. We disagree. Rule 59.01 contemplates prejudgment use—"the court may open the judgment *if one has been entered*." Minn. R. Civ. P. 59.01 (emphasis added).

We review for abuse of discretion a district court's decision to reopen the record before a judgment is entered. *Cf. Johnson v. Lorraine Park Apts., Inc.*, 268 Minn. 273, 277, 128 N.W.2d 758, 761 (1964) (stating in a case involving a denial of a prejudgment reopening of the record that "the trial court has broad discretion in determining whether new evidence justifies a new trial"). We conclude that the district court did not abuse its discretion by reopening the record before issuing its commitment order.

**Shue's Commitment as SDP and SPP**

Shue argues that the county failed to prove by clear and convincing evidence that he meets the criteria for commitment as an SDP or an SPP. Clear and convincing evidence is "more than a preponderance of the evidence but less than proof beyond a reasonable doubt" and "will be shown where the truth of the facts asserted is 'highly probable.'" *Weber v. Anderson*, 269 N.W.2d 892, 895 (Minn. 1978). The clear-and-convincing-evidence standard is "a relatively *high* burden of persuasion." *In re Civil Commitment of Ince*, 847 N.W.2d 13, 20 (Minn. 2014). Whether a person meets the statutory criteria for commitment based on clear and convincing evidence is a question of law that we review de novo. *In re Linehan*, 518 N.W.2d 609, 613 (Minn. 1994). We review findings of fact for clear error, Minn. R. Civ. P. 52.01, in the light most favorable to the district court's decision, *In re Knops*, 536 N.W.2d 616, 620 (Minn. 1995). "[T]he trier of fact is in the best position to determine credibility . . . ." *Ince*, 847 N.W.2d at 24 (quotation omitted).[2]

---

[2] We note that the district court issued its commitment order in this case on February 24, 2014, without the benefit of *Ince*.

*SDP*

To commit someone as an SDP, "the district court must find by clear and convincing evidence that the person: (1) has engaged in a course of harmful sexual conduct; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct." *Id*. at 20 (citing Minn. Stat. §§ 253B.02, subd. 18c(a), .18, subd. 1, .185, subd. 1 (2012)).[3] A finding that a person is "likely" to engage in acts of harmful sexual conduct "require[s] clear and convincing evidence that the person is 'highly likely' to engage in acts of harmful sexual conduct." *Id*. at 22. "'[H]ighly likely' cannot be defined by a numeric value." *Id*. at 21.

As in *Ince*, Shue contests only whether he is highly likely to engage in acts of harmful sexual conduct. *See id.* at 19 n.2. We therefore begin with "the element of 'likely' future harmful sexual conduct as a result of a personality disorder." *Id*. at 19.

In evaluating the likelihood of future harmful sexual conduct, a district court must engage in a "multi-factor analysis" that considers

> (a) the person's relevant demographic characteristics (e.g., age, education, etc.); (b) the person's history of violent behavior (paying particular attention to recency, severity, and frequency of violent acts); (c) the base rate statistics for violent behavior among individuals of this person's background (e.g., data showing the rate at which rapists recidivate, the correlation between age and criminal sexual activity, etc.); (d) the sources of stress in the environment (cognitive and affective factors which indicate that the person may be predisposed to cope with stress in a violent or nonviolent manner); (e) the similarity of the present or future

[3] Minn. Stat. § 253B.02, subd. 18c(a), was recodified as Minn. Stat. § 253D.02, subd. 16(a) (Supp. 2013). Minn. Stat. § 253B.185, subd. 1, was recodified as Minn. Stat. § 253D.07 (Supp. 2013).

7

context to those contexts in which the person has used violence in the past; and (f) the person's record with respect to sex therapy programs.

*Id*. at 22 (quoting *Linehan*, 518 N.W.2d at 614).

Shue argues that the district court incorrectly weighed evidence and determined credibility with regard to expert testimony on whether actuarial studies suggested Shue is highly likely to reoffend. "[A]ctuarial assessment evidence is relevant to the determination of whether a person is highly likely to engage in future harmful sexual conduct." *Id.* at 24. But actuarial assessment evidence has not displaced the *Linehan* factors because "the dangerousness prediction is neither a purely clinical prediction nor simply a matter for statisticians." *Id.* at 23 (quotations omitted). And "[t]he third *Linehan* factor, 'base rate statistics,' does not mention the more individualized predictions that can be drawn from actuarial tools. The term 'base rate statistics' refers to recidivism rates for a particular class . . . ." *Id.* at 22 n.3 (citation omitted). Instead, actuarial assessments are relevant evidence to be considered within the *Linehan* framework, and "with the benefit of all the relevant and reliable evidence, the district court must make a good faith attempt to isolate the most important factors in predicting harmful sexual conduct." *Id.* at 23 (quotation omitted). Expert testimony regarding actuarial studies therefore is subsumed within the *Linehan* factors. *Id*. at 24–25. "As the trier of fact, the district court will be in the best position to determine the weight to be attributed to each factor, as well as to evaluate the credibility of witnesses-a critical function in these cases that rely so heavily on the opinions of experts." *Id.* at 23–24.

8

Shue challenges the district court's application of the *Linehan* factors that resulted in its finding that Shue is highly likely to reoffend. The district court evaluated the evidence concerning each *Linehan* factor and found that Shue is highly likely to reoffend. Although the court found the expert testimony of Drs. Zwecker and Gilbertson credible, the court noted in its order that it independently applied the *Linehan* factors to the evidence in finding that Shue is highly likely to reoffend. And the court noted that, while no single *Linehan* factor is more important than any other, all the factors indicate that Shue is highly likely to reoffend.

The district court found that relevant demographic characteristics indicate that Shue is at a "higher risk" to reoffend, noting Dr. Zwecker's report, which states that Shue's sex, his age, and the fact that he has reoffended after receiving sanctions increase his risk to reoffend. The court also referenced the testimony of Dr. Gilbertson, who opined that, under this *Linehan* factor, Shue's risk is increased because males have a higher risk of sexual reoffense and Shue's mental illness will require constant vigilance to keep in check. In addition, the court noted that Dr. Riedel stated in his report that Shue "shares many demographic characteristics that have been shown to be relevant to sexual offending." We conclude that the district court did not clearly err by finding that relevant demographic characteristics show Shue has a high risk to reoffend.

The district court found that Shue's history of violent behavior shows a high risk to reoffend. The court cited Dr. Zwecker's report, in which she noted that Shue has a "clear history of violent behavior toward others, both within the context of his sex offending and in other areas." The court also noted Dr. Gilbertson's testimony that this

9

*Linehan* factor supports an increased risk for Shue because his record is "replete with violence, both sexual and non-sexual." And the court quoted from Dr. Riedel's report, in which he described Shue's history as "replete with violence and aggression." We conclude that the district court did not clearly err by finding that Shue's history of violent behavior indicates that he has a high risk to reoffend.

The district court found that base-rate statistics also put Shue at a high risk to reoffend. Dr. Zwecker noted in her report conflicting conclusions between Shue's Static-99R score, which places him in the "high risk" category and indicates that he may be likely to engage in future acts of harmful sexual conduct, and Shue's MnSOST-3.1 results, which put him in the "moderate risk" category, suggesting that he is not likely to engage in future acts of harmful sexual conduct. At trial, Dr. Zwecker reviewed *In re Civil Commitment of Navratil*, 799 N.W.2d 643 (Minn. App. 2011), *review denied* (Minn. Aug. 24, 2011), and testified that Shue's test scores are higher than the base rates, meaning he has a "moderate to high likelihood of re-offense." Dr. Gilbertson testified that Shue's actuarial scores are greater than the base rate; specifically, Shue's score of 6 on the Static-99R is higher than the base rate of 2, which places Shue in the high-risk, high-need group whose members have a predicted recidivism rate of 31% over five years and 48% over ten years.

Concerning the base-rate statistics factor, the district court noted Dr. Riedel's testimony that, although Shue's Static-99 score from 2002, when he was released from prison in Iowa, was lower than it is now, the Iowa Department of Corrections rated Shue as high risk, and Shue, in fact, did reoffend. In his report, Dr. Riedel gave Shue's score

10

on the SRA-FV as 2.92, but on cross-examination, Dr. Riedel admitted that he scored several areas inaccurately on the test and that the new score "would change at least aspects" of the test. The court noted Dr. Riedel's testimony that he should not have included the Stable-2007 test in his report because no one used the test to evaluate Shue, and the court noted Dr. Riedel's concession on cross-examination that the 2007 department of corrections study of sexual recidivism, which he mentioned in his report, was "a definitive statistical study of recidivism" but "doesn't necessarily relate . . . to the effectiveness of post-release things," did not include individuals on probation for sex offenses, and did not measure lifetime recidivism. The court explained that it did not find the 2007 study applicable to Shue's case because the study "is not definitive on the issue of re-offense, it was not designed to measure base rates, the study only looked at offenders from 1990 to 2002 and 11 years of information is not included in its results, and many high risk offenders were not a part of the study." While we note that some of the evidence cited by the district court in regard to this factor is actuarial, as opposed to base-rate, we conclude that the district court did not clearly err by finding that Shue's base-rate statistics show he has a high risk to reoffend.

The district court found that the sources of stress in Shue's environment indicate that he is at high risk of reoffense. Dr. Zwecker stated that Shue appears to have a "limited support network," which could become a source of stress for him. Dr. Zwecker opined that Shue is impulsive and will likely become stressed about having to participate in sex-offender treatment and abstain from illegal chemicals. Dr. Zwecker testified that Shue's housing and marriage issues may become sources of stress for him and noted that

11

he has a history of "not reacting well to stress" in both the community and in prison. Dr. Gilbertson testified that this *Linehan* factor increases Shue's risk. Dr. Riedel noted in his report that he "see[s] some concerns here" and characterized Shue's release plan as "sketchy at best." We conclude that the district court did not clearly err in finding that the sources of stress in Shue's environment indicate that he has a high risk to reoffend.

The district court found that the similarity of Shue's present and future contexts to contexts in which he has used violence in the past indicates a high likelihood of recidivism. Dr. Zwecker noted that Shue plans to live in the same area where he offended in the past, would have access to the same people whom he victimized in the past, would likely resume visiting the same places to seek out past victims, and does not have an adequate support network to keep him from reoffending. Dr. Zwecker testified about her concerns that Shue would be able to "play the game" with an ISR agent by acting appropriately when the agent visits and then returning to poor behavior once the agent leaves. Dr. Gilbertson testified that the similarity of Shue's present and future contexts to past contexts increases Shue's risk. He stated that Shue's chemical dependency disinhibits him and noted that Shue has suggested that his sexual energy and arousal increase when he takes methamphetamines. Dr. Gilbertson characterized Shue's release plans as "fairly sketchy." Dr. Riedel expressed concern in his report that the acquaintances that Shue has in the area in which he planned to live would not support his recovery. We conclude that the district court did not clearly err in finding that the similarity of Shue's present or future contexts with his past contexts indicates he has a high risk to reoffend.

The district court found that Shue's record with respect to sex-offender treatment indicates an increased likelihood to reoffend. Dr. Zwecker stated that Shue has never participated in a sex-offender treatment program and he has virtually no knowledge of treatment principles. Dr. Zwecker expressed concern about Shue's testimony, indicating his belief that he does not need sex-offender treatment, although she later testified that he indicated that he would participate in treatment. Dr. Gilbertson opined that this factor increases Shue's risk because Shue does not know any treatment principles that would help him control his sexual behavior; his chemical-dependency treatment in prison only would be of minimal help to him, because chemical-dependency and sexual-offender treatment are so different; and Shue does not understand his sexual triggers, high-risk situations, or mental illness. We conclude that the district court did not clearly err by finding that Shue's history of sex-offender treatment indicates that he has a high risk to reoffend.

We conclude that the district court applied the *Linehan* framework properly and did not clearly err in its findings. We further conclude that the district court did not err by committing Shue as an SDP.

*SPP*

Shue argues that the county failed to prove by clear and convincing evidence that he meets all of the elements of the SPP statute. "Sexual psychopathic personality" is defined as

> the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the

consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons.

Minn. Stat. § 253D.02, subd. 15 (Supp. 2013). Shue again argues that the district court incorrectly weighed evidence and determined credibility regarding expert testimony. We defer to the district court's credibility determinations. *See Ince*, 847 N.W.2d at 23−24.

The district court found that Shue possesses all four conditions specified in the SPP statute and that the conditions cause him to act irresponsibly with regard to sexual matters. Dr. Zwecker observed that Shue has been emotionally unstable while incarcerated, particularly when he is not taking psychiatric medication, and has made threats to harm staff. Dr. Zwecker also opined that Shue exhibits impulsive behavior and pointed to his failure to follow rules while in prison as an example of such behavior. Dr. Zwecker stated that Shue's "ability to show good judgment is highly doubtful at the present time." She also noted that Shue failed to appreciate the consequences of his personal acts by demonstrating no concern about the impact of his sexual assaults and by blaming his victims for his current predicament. The district court also mentioned Dr. Riedel's report, wherein he stated that Shue has exhibited all four of the conditions in the past but that he did not show emotional instability or impulsiveness of behavior when medicated. The district court discounted Dr. Riedel's opinion, however, because it "ignores Shue's entire history of behavior, places too much emphasis on Shue's limited history of taking medications in a controlled setting, and ignores Shue's history of being

14

non-medication compliant and not being chemical-free while in the community." We conclude that the district court did not clearly err in finding that Shue possesses the four conditions stated in the SPP statute.

The district court found that Shue engaged in a habitual course of sexual misconduct. In her report, Dr. Zwecker opined that Shue met this element because "[h]e has committed sex offenses over a number of years." She also noted that, in at least one of the offenses, Shue showed sadistic tendencies. Dr. Gilbertson testified that Shue has engaged in a habitual course of sexual misconduct because his sexual misconduct spanned several years and took place even after he was in prison. Although the district court found that "Dr. Riedel testified that Shue has engaged in a course of harmful sexual conduct, but not a habitual course of misconduct," Dr. Riedel testified that, although Shue does not meet the psychological definition of habituation, he "probably does" meet the legal definition. The district court found the opinions of Drs. Zwecker and Gilbertson about Shue's habitual misconduct to be credible and persuasive. We conclude that the district court did not clearly err in finding that Shue engaged in a habitual pattern of harmful sexual conduct.

The district court found that Shue has an utter lack of power to control his sexual impulses within the meaning of the SPP statute. In evaluating whether a person meets this criterion, the district court must consider

> the nature and frequency of the sexual assaults, the degree of
> violence involved, the relationship (or lack thereof) between
> the offender and the victims, the offender's attitude and
> mood, the offender's medical and family history, the results
> of psychological and psychiatric testing and evaluation, and

15

> such other factors that bear on the predatory sex impulse and the lack of power to control it.

*In re Blodgett*, 510 N.W.2d 910, 915 (Minn. 1994). The district court refers to the opinions of Drs. Zwecker and Riedel in addressing this element in its commitment order but found only Dr. Zwecker's opinion to be credible. Dr. Zwecker noted that Shue's behavior "shows a pattern of victimizing females with whom he is partying and using chemicals." The district court found that the nature and frequency of Shue's sexual assaults supported a determination that Shue has an utter lack of power to control his sexual impulses.

The district court found that the degree of violence involved in Shue's sexual assaults also indicates that Shue has an utter lack of power to control his sexual impulses. The district court relied on Dr. Zwecker's report, in which she stated that Shue has a history of violence aside from his sex offenses and that his sexual assaults have included kidnapping and extreme violence. The district court also found that the relationship between Shue and his victims supports a finding that Shue has an utter lack of control. Dr. Zwecker wrote that Shue knew his victims and partied with some of them.

The district court found that Shue's attitude and mood "predispose him to sexual offending." Dr. Zwecker observed that Shue has exhibited a superficial attitude toward his sex offenses and has minimized or even denied the offenses. Dr. Zwecker also remarked that Shue has sought to blame his victims. The district court mentioned Dr. Riedel's observation that "[i]t is only within about the last four years that the violence has

waned and [Shue] has not had violations relating to violent acting out" but noted that this observation failed to take into account Shue's violent behavior in May 2012.

Regarding Shue's medical and family history, the district court found only that "Shue has serious medical issues." Regarding the results of Shue's psychological and psychiatric testing, the district court found that they support the conclusion that Shue utterly lacks the power to control his sexual impulses. Dr. Zwecker testified that Shue's MMPI result showed antisocial behavior and impulsivity that would increase his likelihood of reoffense. Although the district court relied on Dr. Zwecker's report and testimony in finding that Shue has an utter lack of power to control his sexual impulses within the meaning of the SPP statute, the court clarified that it conducted its own analysis to make this finding. The district court did not clearly err in finding that Shue utterly lacks the power to control his sexual impulses.

The district court found that Shue is dangerous to others. To determine whether an offender is dangerous to others under the SPP statute, the district court must consider the same factors analyzed in determining whether an offender is highly likely to reoffend under the SDP statute. *See Linehan*, 518 N.W.2d at 614 (admonishing courts to consider the *Linehan* factors when determining whether an individual is dangerous to the public). The analysis above indicates that the district court did not clearly err in finding that Shue is dangerous to others.

Although decided after the district court issued its commitment order and after the parties in this case filed their briefs, we consider the sufficiency of the district court's findings in light of *In re Civil Commitment of Spicer*, ___ N.W.2d ___ (Minn. App.

17

Aug. 18, 2014). The district court committed Spicer as an SDP and SPP. *Id.*, 2014 WL 4056029, at *2. This court concluded that the district court's findings that Spicer met the statutory criteria as an SDP were insufficient in three ways. First, we concluded that "the vast majority of the district court's findings are not truly findings of fact because they are merely recitations of the evidence presented at trial," e.g., the court summarized statements made by a particular expert. *Id.* at *6. A district court's findings are insufficient if they "'merely recite[] or summarize[] excerpted portions of testimony of [the] witnesses without commenting independently either upon their opinions or the foundation for their opinions or the relative credibility of the various witnesses.'" *Id.* (alterations in original) (quoting *In re Welfare of M.M.*, 452 N.W.2d 236, 239 (Minn. 1990)). "Second, of the 'true findings' concerning disputed issues, nearly all of them are stated in a conclusory manner." *Id.* Third,

> [t]he district court's order states that it considered the *Linehan* factors, but the order does not explain what evidence the district court found most persuasive or least persuasive, which facts the district court found to be most important or least important, or which *Linehan* factors were most significant in the ultimate resolution of the case.

*Id.* at *7. This court identified the same errors by the district court regarding its SPP-related findings. *Id.* at *8.

In this case, the district court also made the first error identified in *Spicer*—the vast majority of findings that relate to SDP and SPP statutory criteria are not truly findings, but rather are recitations of expert trial testimony. But, here, the district court did not commit the second error identified in *Spicer* because the court's findings on each

18

challenged statutory criterion are not stated in a conclusory manner. The findings are detailed and relate specifically to the evidence in the record. And, here, the district court did not commit the third error committed by the district court in *Spicer* because the court identified the expert testimony on which it relied as to each challenged statutory criterion and each challenged caselaw factor that is relevant to the statutory criteria (e.g., the *Linehan* factors) and made independent findings which included reasons for why it did not credit conflicting expert testimony.

In sum, because the district court did not abuse its discretion in its evidentiary rulings and did not clearly err in its findings, and because the evidence is sufficient to support Shue's commitment as an SDP and SPP, we affirm Shue's commitment as an SDP and SPP.

**Affirmed.**