*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-1091**

In the Matter of the Civil Commitment of: Dwayne Qutez Irving.

**Filed December 29, 2025**
**Affirmed**
**Bratvold, Judge**

Blue Earth County District Court
File No. 07-PR-24-2442

Daniel T. Donnelly, Donnelly Law Office, Austin, Minnesota (for appellant Dwayne Qutez Irving)

Keith Ellison, Attorney General, Lisa Jones, Assistant Attorney General, St. Paul, Minnesota; and

Patrick McDermott, Blue Earth County Attorney, Mankato, Minnesota (for respondent Blue Earth County Human Services)

Considered and decided by Bratvold, Presiding Judge; Schmidt, Judge; and Smith, John, Judge.[*]

**NONPRECEDENTIAL OPINION**

**BRATVOLD**, Judge

In this appeal from an order indeterminately committing him as a sexually dangerous person (SDP), appellant argues that the district court erred in two ways: (1) the record does not establish by clear and convincing evidence that appellant is an SDP, and

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

(2) alternatively, appellant proved by clear and convincing evidence that a less restrictive treatment program was available and appropriate. Because the record establishes that appellant (a) has engaged in a course of harmful sexual conduct, (b) has manifested a sexual, personality, or other mental disorder or dysfunction and, as a result, (c) is likely to engage in future harmful sexual conduct, we affirm the district court's determination that appellant is an SDP. And because appellant failed to prove by clear and convincing evidence that a less restrictive treatment program (a) is available and willing to accept him, (b) is consistent with his treatment needs, and (c) is consistent with the requirements of public safety, we affirm the district court's determination that appellant be indeterminately committed to a secure treatment facility as an SDP.

## FACTS

On December 2, 2024, respondent Blue Earth County Human Services (county) petitioned to civilly commit appellant Dwayne Qutez Irving to the Minnesota Sex Offender Program (MSOP) as an SDP. The opinion summarizes the district court's written factual findings filed after an evidentiary hearing along with other record evidence.

Irving was 48 years old at the time of the district court's evidentiary hearing. Irving has two convictions for criminal sexual conduct and other convictions for various offenses, including domestic abuse, stalking, threats of violence, violations of a domestic-abuse no-contact order (DANCO), violations of an order for protection (OFP), violations of predatory-offender registration requirements, and obstruction of legal process, along with drug, property, fleeing, and other offenses.

2

Beginning with Irving's criminal sexual conduct, in 2000, he was living in Chicago and used a toy gun to force T.J. to perform fellatio on him. Irving pleaded guilty to criminal sexual abuse and was sentenced to four years in an Illinois prison. For the entire period between 1995 and 2014, he was either on probation or incarcerated in Illinois.

In 2014, Irving moved to Minnesota to live with his sister in Mankato. In 2020, Irving was convicted of a second criminal-sexual-conduct offense that occurred within a few months of his being released from prison. Irving had sexual contact with J.G., who was under her mother's guardianship pursuant to a 2015 district court order that found J.G. had a low IQ and lacked "decision-making capabilities." J.G.'s mother "described her as developmentally slow with the mindset of a 13- to 15-year-old." Irving alleges that the sexual contact was consensual and that he was unaware of J.G.'s cognitive limitations. Still, Irving entered an *Alford* plea to fifth-degree criminal sexual conduct.[1]

Irving has a long history of drug use, which he concedes has contributed to his sexual misconduct and criminal record. He has completed some chemical-dependency treatment but has failed to comply with aftercare and has refused treatment.

Some of Irving's sexual misconduct did not result in criminal charges but was admitted as evidence during the evidentiary hearing. In 2020, Irving lived with E.W. and her teenage sons. Irving and E.W. "tried to have an intimate relationship," but there were a "handful of times" when E.W. would wake up in the middle of the night to Irving

---

[1] "An *Alford* plea is a plea in which '[a]n individual accused of [a] crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence' while not admitting guilt." *Doe 136 v. Liebsch*, 872 N.W.2d 875, 879 (Minn. 2015) (quoting *North Carolina v. Alford,* 400 U.S. 25, 37 (1970)).

"standing over her in her room watching her." E.W. "would scream because she was scared," but Irving "continued to do it." E.W. eventually called police to remove Irving from her home, but E.W. testified that Irving twice tried to reenter her home at night. E.W. testified that she "was afraid and intimidated by these events."[2] The district court found that "Irving's parasitic lifestyle and view of women as objects is shown through the testimony of E.W." The district court also found that Irving would "frighten [E.W.] repeatedly by entering her bedroom without consent in the middle of the night" and that he "further frightened [E.W.] when he would yell and become intimidating."

In 2022, Irving met K.M. at a crisis center. K.M. has been subject to guardianship since 2010. Irving stayed in K.M.'s home, where she lived with her parents, for about five days, and the two had a sexual relationship. K.M.'s parents called the police to remove Irving because he would not leave their home. Also in 2022, J.P. told police that Irving exposed his penis when the two were using methamphetamine together; she pushed him away and later threw two bricks at him.

Irving's relationship with A.B. lasted for several years, and A.B. testified in support of Irving at the evidentiary hearing.[3] In September 2016, A.B. reported Irving to law enforcement for hitting her "lightly on the nose during an argument." In August 2017, after

---

[2] E.W. testified that Irving "can get very scary" and that she still puts a chair underneath her doorknob before bed because of him. To be clear, E.W. did not testify that Irving physically or sexually abused her.

[3] A.B. testified that she was not afraid of Irving, that the two maintained what A.B. described as a "friendly-ship," and that she would be a support person for him if he were to remain in the community. The district court found that A.B.'s testimony "appeared [to be] under duress, at times."

Irving threatened to kill A.B. and her children, the district court entered an OFP prohibiting Irving from contacting A.B. Later, A.B. was also protected by a DANCO against Irving.

Irving violated the OFP and DANCO, showing up at A.B.'s home and calling her from the jail. Reports show he was at her home, in violation of the OFP, in September, November, and December 2017, and then again in April 2018. He went to jail in August 2018 and then called A.B. from jail four times, all on different days in September. Irving pleaded guilty to several offenses involving A.B., including violating the OFP, violating the DANCO, and stalking. The district court found that, while Irving was not charged with criminal sexual conduct related to A.B., "many of his offenses were sexually motivated."

Irving testified on his own behalf at the evidentiary hearing. Irving testified that his brother and sister were "his main support in the community." He admitted that, while his family was aware of some of his convictions, they "were unaware of the underlying facts." Irving testified that his plan to ensure he would not commit sexual offenses in the future was to abstain from substance use and "abstain from trying to talk with females, unless they approach him." The district court found that Irving's plan "reveals a lack of awareness of his triggers for reoffending and would not be effective." The district court also found that much of Irving's testimony contradicted other record evidence; for example, Irving denied using a toy gun to force T.J. to perform fellatio, denied he was served with an OFP to protect A.B., and denied other facts that were established by the record.

Irving's brother testified that Irving lived with him at times, including "a little over a year" and that Irving "used drugs" at that time. Brother "tried" to get Irving into

5

chemical-dependency treatment, but Irving refused. Brother testified that he "could not force [Irving] to do anything." The district court found brother to be credible and "understandably concerned" about Irving.

Irving's sister testified that, if Irving were released, he could live with her and work for her cleaning business. Sister had "no concern" about Irving using illegal substances "unless he is in a stressful situation" and agreed that Irving needs therapy but also testified that he need not be committed. The district court found that sister had "good intentions to be a support person for Irving" but that she "did not assist Irving in staying away from controlled substance use or criminal activity in the past."

Drs. Marshall and Dority, both appointed by the district court, testified as experts. Both experts testified similarly, stating that in their opinion, Irving meets the criteria for commitment as an SDP. Both experts testified that Irving had engaged in a course of harmful sexual conduct and that Irving has one or more personality disorders. Dr. Marshall diagnosed Irving with unspecified personality disorder with antisocial traits, among other things, and noted that he also has "a probable diagnosis of other specified paraphilic disorder." A paraphilic disorder "denotes any intense and persistent sexual interest other than sexual interest in . . . consenting human partners." *Diagnostic and Statistical Manual of Mental Disorders* 779 (5th ed. 2022). Dr. Dority diagnosed Irving with unspecified paraphilic disorder and antisocial personality disorder, among other things.

Both experts testified that Irving requires an intensive, highly structured program best provided in an inpatient, residential setting. Dr. Marshall acknowledged that there was sex-offender treatment available in the community where Irving hopes to live, but she

6

expressed her concern that Irving may not follow through. Dr. Dority acknowledged that Irving "could have success" in an outpatient setting such as the "robust," "local" program offered at CORE Professional Services in Mankato, but Irving did not provide any evidence that he had applied for or been accepted into the program. When asked whether he recommended MSOP to "ensure the safety of the community" or because it is the "only place Irving could succeed," Dr. Dority replied, "[A]ll of the above." Dr. Dority also testified that MSOP is the only inpatient residential sex-offender treatment program in the state and that he had ruled out less restrictive alternatives.

On May 21, 2025, the district court filed a 71-page order that included 290 findings of fact and nine conclusions of law. The district court made findings based on the evidence of Irving's criminal sexual conduct—convicted and uncharged—as summarized above. The district court summarized and found credible the testimony from experts Drs. Marshall and Dority. The district court found that "[t]here is clear and convincing evidence that Irving had engaged in a course of harmful sexual conduct." It also found that to be true "whether the acts against A.B. and E.W. are included or not." The district court determined that Irving "has sexual, personality, or other mental disorders that cause him to lack adequate control of his sexual impulses as required for purposes of SDP commitment." And the district court found that Irving is "highly likely" to engage in future acts of harmful sexual conduct. Based on these findings and other evidence, the district court concluded that the county satisfied the requirements for committing Irving to a secure treatment facility as an SDP and that Irving did not meet his burden to prove a less restrictive alternative. The district court ordered that Irving be committed indeterminately to MSOP.

Irving appeals.

## DECISION

**I.  The district court did not err in determining that clear and convincing evidence showed that Irving is a sexually dangerous person.**

To commit someone as an SDP, the district court must find by clear and convincing evidence that the person "(1) has engaged in a course of harmful sexual conduct . . . ; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct." Minn. Stat. § 253D.02, subd. 16(a) (2024); *accord In re Civ. Commitment of Ince*, 847 N.W.2d 13, 20 (Minn. 2014).

Appellate courts review a district court's findings of fact "under a clear error standard to determine whether they are supported by the record as a whole." *Ince*, 847 N.W.2d at 22. Appellate courts defer to the district court's role as fact-finder and its ability to judge the credibility of witnesses. *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 222 (Minn. 2021). Whether the evidence is sufficient to meet the statutory requirements for SDP civil commitment is a question of law that we review de novo. *In re Linehan (Linehan I)*, 518 N.W.2d 609, 613 (Minn. 1994).

### A.  Evidence of Irving's Course of Harmful Sexual Conduct

Irving argues that the record evidence does not establish that he engaged in a course of harmful sexual conduct because his history of sexual offenses is limited to "two highly dissimilar incidents . . . twenty years apart from one another." Citing *In re Monson*, Irving

8

argues that his record of sexual misconduct is markedly dissimilar to that of others who have been civilly committed as SDPs. 478 N.W.2d 785, 786-89 (Minn. App. 1991).

Irving does not dispute that the sexual misconduct on which the district court based its findings was harmful. "Harmful sexual conduct" is "sexual conduct that creates a substantial likelihood of serious physical or emotional harm to another." Minn. Stat. § 253D.02, subd. 8 (2024). Neither the statute nor the caselaw defines "course," but the dictionary definition includes "[a] systematic or orderly succession; a sequence." *The American Heritage Dictionary of the English Language* 419 (5th ed. 2011).

According to caselaw reviewing SDP civil commitments, "[t]he incidents that establish the course [of harmful sexual conduct] will have occurred over a period of time and need not be recent." *In re Civ. Commitment of Stone*, 711 N.W.2d 831, 837 (Minn. App. 2006), *rev. denied* (Minn. June 20, 2006). And "the existence of a period in which a person has not committed sex offenses does not preclude a determination that he engaged in a course of sexual misconduct." *Id.* at 838. Persuasive authority has recognized that no specific number of victims or sexual offenses must be present before a district court can find that a "course" of harmful sexual conduct exists. *See In re Civ. Commitment of Taylor*, No. CX-02-1102, 2002 WL 31890941, at *1, *6 (Minn. App. Dec. 31, 2002) (concluding that, though the appellant had only two convictions, the record supported the district court's finding that the appellant engaged in a course of harmful sexual conduct), *rev. denied* (Minn. Feb. 26, 2003).[4]

---

[4] Nonprecedential opinions are not binding authority but may be cited for their persuasive value. Minn. R. Civ. App. P. 136.01, subd. 1(c).

The record of Irving's harmful sexual conduct includes two convictions. First, the original incident report for Irving's 2000 sexual offense summarizes T.J.'s statement that Irving placed a toy handgun to her side and forced her to perform fellatio. When Irving testified about this incident during commitment proceedings, he maintained that, contrary to the record, he knew the victim was a prostitute, she agreed to give him sex in exchange for ten dollars, and he did not have a toy gun. But Irving pleaded guilty to criminal sexual abuse of T.J. and was sentenced to four years in prison.

As for Irving's sexual offenses toward J.G., a vulnerable adult under guardianship, Irving agreed that he asked to see J.G.'s breasts and that he paid her "in exchange for sex." And while Irving denied knowing about J.G.'s guardianship, J.G.'s guardianship order is in the record. Irving entered an *Alford* plea, admitting that the evidence showed he committed fifth-degree criminal sexual conduct against J.G. based on her guardianship status.

Similarly, the record of Irving's uncharged incidents of sexual misconduct is clear and convincing. Irving denied knowing that K.M. was under guardianship, but he agreed that he had a sexual relationship with K.M., and the record includes evidence of K.M.'s guardianship. The district court's findings about the incident with J.P. are also supported by Irving's testimony that J.P. threw bricks at him the day after the two were using methamphetamines together and Irving exposed himself to her.

The record supports the district court's findings about Irving's offenses against A.B. In the fall of 2018, A.B. spoke to Irving's probation agent about "ongoing emotional and psychological abuse" in the relationship, saying that Irving would not "leave her alone,"

10

that her "kids [were] scared of" Irving, and that Irving "would go to her daughter's bus stop and sit and watch her daughter." The probation agent's reports also documented Irving's calls to A.B. from jail despite an active OFP and DANCO. Irving pleaded guilty to stalking and gross-misdemeanor violation of an OFP, among other crimes involving A.B.

We acknowledge that the experts disagreed on whether Irving's conduct toward A.B. was part of the "course of harmful sexual conduct." Dr. Dority testified that it was not, but Dr. Marshall testified that it was because "what [Irving] exhibited [toward A.B.] was power and control and . . . violence and she asked him to leave, and he would keep showing up." Because "we will defer to the district court's resolution of conflicting expert testimony," *In re Civ. Commitment of Crosby*, 824 N.W.2d 351, 361 (Minn. App. 2013), *rev. denied* (Minn. Mar. 27, 2013), and the district court found that Irving had engaged in "criminal conduct" toward A.B., some of which was "sexually motivated," we conclude that the evidence of Irving's conduct toward A.B. supports the district court's conclusion.

Finally, the record contains Irving's full criminal record, and each conviction was proved beyond a reasonable doubt; therefore, there is at least clear and convincing evidence to support the district court's findings on Irving's nonsexual criminal offenses. The record evidence also shows Irving's probation violations, supervised-release violations, and conditional-release violations. Dr. Marshall testified, "I consider [Irving] to be a release violator. He was in prison at least four times in Illinois before coming here. And he keeps going in and out, in and out, in and out."

11

Although Irving is correct that his convictions for sexual offenses involved "two highly dissimilar incidents" that occurred "twenty years apart," the district court also found that Irving engaged in uncharged sexual misconduct against many victims and that this conduct was harmful. Irving acknowledges in his brief that caselaw recognizes uncharged behavior may establish a course of harmful sexual conduct under the civil-commitment statute. *See In re Civ. Commitment of Ramey*, 648 N.W.2d 260, 268 (Minn. App. 2002), *rev. denied* (Minn. Sept. 17, 2002); *Monson*, 478 N.W.2d at 789. In fact, in persuasive opinions, this court has affirmed SDP designations for offenders with no or one criminal conviction. *In re Civ. Commitment of Moore*, No. A09-0623, 2009 WL 2747980, at *5, *7 (Minn. App. Sept. 1, 2009) (no criminal-sexual -conduct conviction), *rev. denied* (Minn. Nov. 17, 2009); *see also In re Civ. Commitment of Parks*, No. A09-126, 2009 WL 2226792, at *3 (Minn. App. July 28, 2009) ("That Parks has only one conviction for criminal-sexual conduct does not prevent the conclusion that he engaged in a course of harmful sexual conduct."), *rev. denied* (Minn. Oct. 20, 2009).

Although the experts did not completely align on which women were victims of Irving's course of harmful sexual conduct, both experts opined that Irving had engaged in a course of harmful sexual conduct involving T.J., J.G., and K.M. We conclude that clear and convincing evidence supports the district court's determination that Irving engaged in a course of harmful sexual conduct.

12

**B.** **Evidence Irving Manifested a Sexual Disorder and Lacked Adequate Control of Sexual Impulses**

To satisfy the second element, the record must establish that the person has a disorder or dysfunction which causes them to lack adequate control of their sexual impulses. *In re Linehan (Linehan IV)*, 594 N.W.2d 867, 876 (Minn. 1999). "[T]he Minnesota SDP Act 'requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior.'" *Id.* at 875 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997)).

Irving argues that, while it "may even be true that he suffers from one or more disorders," the evidence offered by the county "bears [no] resemblance" to the "lack [of] adequate control contemplated in the most important caselaw." Specifically, Irving argues that *Linehan IV* illustrates what the law requires for a district court to find that a person lacks adequate control over their sexual impulses. In *Linehan IV*, the record showed that Linehan displayed a "long course of harmful sexual conduct" starting "in his teens" that included multiple sexual assaults and rapes, windowpeeping, and murder; he also continued to offend sexually even after he escaped from prison. *Id.* at 869.

Dr. Marshall testified that she diagnosed Irving with unspecified personality disorder with antisocial traits as well as cannabis-use disorder and stimulant-use disorder, both in remission. She also testified that Irving "does not appear to have adequate control when there is an available person present that he could take advantage of" and that "[i]t is primarily his personality disorder that causes him to have the problems he has." When

13

asked by the county attorney whether Irving's personality disorder causes him "to lack adequate control over his sexually harmful behavior," Dr. Marshall responded, "Yes, it does."

Dr. Dority testified that he diagnosed Irving with antisocial personality disorder and unspecified paraphilic disorder. When asked by the county attorney whether Irving's personality disorder caused him to lack adequate control over his sexually harmful behavior, Dr. Dority responded, "Yes." Dr. Dority supported his answer by testifying that Irving has a consistent record of criminal behavior showing a lack of concern about others, engages in impulsive acts leading to criminal charges, and exhibits "dis-controlled behavior."

While Irving is correct that his criminal sexual history is not as extensive as Linehan's, we are not persuaded that proof of a long criminal sexual history is required by the statutory standard or by caselaw. As stated above, a person may meet the statutory criteria to be committed as an SDP without a single conviction. The district court found—based on clear and convincing record evidence including expert testimony that the court found credible—that Irving's disorder causes him to lack adequate control over his sexual impulses. The district court did not clearly err in its finding.

## C.     Evidence Irving is Highly Likely to Reoffend

The Minnesota Supreme Court has directed district courts to consider the *Linehan* factors to evaluate the likelihood of future harmful sexual conduct. *Linehan I*, 518 N.W.2d at 614. Those factors include the following:

> (a) the person's relevant demographic characteristics (*e.g.*, age, education, etc.); (b) the person's history of violent behavior (paying particular attention to recency, severity, and frequency of violent acts); (c) the base rate statistics for violent behavior among individuals of this person's background (*e.g.*, data showing the rate at which rapists recidivate, the correlation between age and criminal sexual activity, etc.); (d) the sources of stress in the environment (cognitive and affective factors which indicate that the person may be predisposed to cope with stress in a violent or nonviolent manner); (e) the similarity of the present or future context to those contexts in which the person has used violence in the past; and (f) the person's record with respect to sex therapy programs.

*Id.* The word "likely" requires "clear and convincing evidence that the person is 'highly likely' to engage in acts of harmful sexual conduct." *Ince*, 847 N.W.2d at 22. And "'highly likely' cannot be defined by a numeric value." *Id.* at 21. Experts may use their specialized knowledge to assist the trier of fact in determining a person's psychological state. *In re Civ. Commitment of Jackson*, 658 N.W.2d 219, 227 (Minn. App. 2003), *rev. denied* (Minn. May 20, 2003). We defer to the district court's weighing of evidence relevant to whether an individual is highly likely to engage in harmful sexual conduct. *See Ince*, 847 N.W.2d at 23-24 (acknowledging that, in making a commitment decision, district courts undertake a "difficult task" often requiring consideration of a "voluminous and complex" record followed by a "careful balancing of all the relevant facts" and concluding that district courts

are in "the best position to determine the weight to be attributed to each factor" (quotations omitted)).

The district court found that Irving was highly likely to sexually reoffend. This finding was based on a "combination of assessment of static risk factors, dynamic risk factors and the application of the *Linehan* factors analyzed by Drs. Marshall and Dority."[5] Specifically, the district court found that the experts' opinions and testimony were "credible and persuasive," in part "because the experts conducted multifaceted assessments and considered individual risk factors rather than relying entirely upon actuarial risk tools to determine risk." The district court also found that Irving's score on the Static-99R was

---

[5] The experts testified that they performed actuarial assessments of Irving's risk, including the Static 99-R, HARE Psychopathy Checklist (HARE PCL-R), and the Violence Risk Scale—Sex Offense (VRS-SO). Dr. Marshall testified that the Static 99-R is "an instrument that is used to evaluate risk of an individual" and that it is "widely used." She scored Irving as a 5 on the assessment, which is "in the well above average range for committing another sexual offense," but she acknowledged that his score could be as high as 6, depending on whether he knew his first victim. She also assessed Irving using the HARE PCL-R, which "measures psychopathy on a continuum from less to more" and looks "at a person's ability . . . to be violent." She found that his score was 28, which is a "high score," and concluded that "Irving is a clinical psychopath, basically."

Dr. Dority testified that the Static-99R is a "gold standard robust" tool and that Irving scored a 6, which is "well above average" and places him in "the highest risk level." He also testified that a score of 6 correlates with a percentile of 94.2, indicating that "only six percent of persons score any higher" and that the ten-year recidivism rate associated with that score is "30-45%." Dr. Dority testified that, using the HARE PCL-R—the "gold standard tool" for assessing psychopathy or psychopathic personality, which he "always" uses in an SDP case—Irving scored 24 with a standard deviation of 3. This score indicates that Irving is in the "moderate psychopathy range," and based on this assessment and Irving's record, Dr. Dority believed that Irving was highly likely to reoffend. Dr. Dority also assessed Irving using the VRS-SO, which "looks at dynamic [risk] factors," and found that his score was 36, placing Irving in the 94th percentile.

We observe that Irving's scores on the assessments used by the experts support the district court's finding that Irving is highly likely to sexually reoffend.

"considerably higher than the average score" and that Irving's score indicates a "sexual recidivism rate that is 3.77 times the rate of average sex offenders" with a "10-year sexual recidivism rate [of] between approximately 30% and nearly 45%." It found that Irving's score on the HARE PCL-R—an "instrument [that] is widely accepted in forensic settings and frequently used in the assessment of psychopathy for individuals being considered for commitment as a SDP"—"is close to the cutoff some recognize to be considered a clinical psychopath." Finally, the district court found that Irving's "risk level was in the highest possible category" and "well above average risk."

The district court also made findings on each *Linehan* factor, which we summarize in part:

- *Factor (a): relevant demographic characteristics.* "Irving's age of 48 may be a factor that could reduce his risk."

- *Factor (b): history of violent behavior.* "Irving has a significant history of intimidating others and engaging in assaultive, aggressive and violent behavior. He has numerous violations of orders for protection and convictions for assault."

- *Factor (c): base-rate statistics.* Irving's statistics for violent behavior were "well above average from the base rate, as demonstrated by the measures and actuarial instruments the examiners utilized."

- *Factor (d): sources of stress in the environment.* Irving "has difficulty coping with stressors," "has difficulty remaining sober," and "would likely relapse with controlled substances if he felt stressed."

- *Factor (e): similarity of the present or future context to those contexts in which the person has used violence in the past.* Irving's release plan will put him in the same situation he was in the last time he was in the community— he plans to live with his sister, which he had the opportunity to do before, and the last time he was on intensive supervised release (ISR), he failed to abide by the ISR conditions.

17

- *Factor (f): record of sex-offender treatment.* Irving has never participated in sex-offender treatment. Although Irving completed chemical-dependency treatment while in jail, he "did not follow through with any aftercare or support meetings."

In conclusion, the district court found that "Irving is highly likely to sexually reoffend in the future" and that the county "met the burden by clear and convincing evidence that Irving meets the statutory definition of an individual who is a sexually dangerous person."

Irving argues that the evidence is "simply too thin and too equivocal" to support, under the clear-and-convincing standard, the district court's finding that he is highly likely to sexually reoffend in the future. Irving cites, for example, Dr. Dority's testimony acknowledging that Irving's age reduces his risk to reoffend because "the older a person gets the less likely they tend to be to engage in criminal sexual behavior or any . . . troublesome behavior actually," that Irving's score on the HARE PCL-R is "not too far from . . . the low range," and that Irving did not qualify for a score of "hardcore psychopathy." Irving also cites Dr. Dority's conclusion that "it's not all bad" and Dr. Dority's acknowledgment that, while Irving's release plan would include him living in the community—which, Dr. Dority opined, would "be a stressful environment to try and reenter again"—Irving "has family" in the area and the community can be "supportive."

In short, the record evidence supports the district court's finding that Irving is highly likely to sexually reoffend. Both experts agreed that Irving is "highly likely" to sexually reoffend "in the future," and the district court found that the experts were "credible and

18

persuasive."[6] The district court analyzed Irving's risk based on the *Linehan* factors, and in performing that analysis, it relied on the experts' testimony and assessments. It also relied on Irving's own testimony and the testimony of his brother and sister. For example, the district court found, based in part on Irving's sister's testimony, that Irving "would likely relapse" if released into the same environment as his past offending environment and he felt stressed.

Irving testified that his chemical use drove his sexual-offending behaviors and that he had refused treatment and had a history of disregarding aftercare following treatment. Based on this evidence, the district court concluded that Irving was highly likely to reoffend if released into the community. The district court also relied on Irving's criminal record, citing Irving's "poor ability to maintain compliance with release conditions, particularly sobriety, and [his] probation violations, new criminal charges, and incarceration." The record also shows that Irving has failed to stay sober or complete drug testing, even when required to do so under supervised release. Irving has violated probation many times, has been charged with new crimes, and has been incarcerated on and off since arriving in Minnesota in 2014.

---

[6] We distinguish Irving's case from the record in *Ince.* In both cases, a district court relied on expert testimony in civilly committing a respondent as an SDP. In *Ince*, the supreme court held that a district court may not "simply review[] the *Linehan* factors after largely accepting [one expert's opinions] without indicating the significance of any of those factors within the context of a multi-factor analysis." *Ince*, 847 N.W.2d at 24. There, the district court found that the first expert's opinion was "particularly persuasive and convincing" and rejected the testimony of the other experts who did not agree with the first expert. *Id.* at 18. But here, both experts agreed that Irving was highly likely to reoffend, and the district court agreed with the experts' conclusions while also performing its own independent analysis of the *Linehan* factors.

The record supports the district court's findings that Irving is highly likely to reoffend sexually. The district court did not err in finding that the record supports all three elements required to civilly commit Irving as an SDP under section 253D.02, subdivision 16.

**II.    The district court did not err in concluding that Irving failed to prove by clear and convincing evidence that a less restrictive alternative placement was available, consistent with Irving's treatment needs, and consistent with the requirements of public safety.**

Alternatively, Irving argues that the district court erred in finding that he did not establish by clear and convincing evidence that "a less restrictive treatment program" under Minnesota Statutes section 253D.07, subdivision 3 (2024), was available and appropriate for him. This court reviews a district court's decision not to adopt a less restrictive alternative placement using the clear-error standard. *In re Thulin*, 660 N.W.2d 140, 144 (Minn. App. 2003) (affirming appellant's civil commitment as mentally ill).

To avoid commitment to a secure treatment facility, a person designated as an SDP must prove by clear and convincing evidence that (1) a less restrictive treatment program is available and willing to accept the person, (2) the program is consistent with the person's treatment needs, and (3) the program is consistent with the requirements of public safety. Minn. Stat. § 253D.07, subd. 3.

The district court found that "Irving did not present any evidence that there is a less restrictive treatment program [than MSOP] available or willing to accept him as a possible alternative to commitment." It found that MSOP "is an appropriate treatment program for

20

Irving, and there are no less restrictive alternatives that meet Irving's treatment needs and the requirements of public safety."

Irving contends that a less restrictive alternative to commitment would "best serve the legitimate interests of all parties." During his testimony, he proposed that he would attend outpatient treatment at CORE Professional Services in Mankato, live with his sister, and work at her cleaning company. Irving cites Dr. Dority's testimony that CORE offers a "robust outpatient treatment program." He also cites Dr. Dority's testimony that Irving tends to have fewer incidents of sexual misconduct than the average person Dr. Dority has interviewed.

Finally, Irving relies on his own testimony that he has a realistic plan to reintegrate with society in a positive way. He testified, "[N]ow I got something positive to go back to the streets to. . . . I got a home site to go to . . . [w]on't miss no more . . . failure to register stuff. . . . I got a job. . . . I got positive people that's got my back now." He testified that, due to his age and declining health, he is highly motivated to avoid drug use and to avoid situations that put him at risk for future sexual offenses. Irving also argues that the district court should have "accorded much greater importance" to the fact that Irving "does not have a history of refusing sex-offender treatment and has not been unsuccessfully terminated from sex-offender treatment."

Irving did not carry his burden on this issue. Both experts opined that Irving needs secure residential sex-offender treatment, which only MSOP provides. Some evidence suggests that Irving could succeed in a less restrictive treatment program. Dr. Dority testified that Irving "could have success" in an outpatient program. But the statute requires

21

that the SDP prove three elements to avoid commitment to a secure treatment facility, and one of those elements is that a less restrictive program is available and willing to accept the person. *See* Minn. Stat. § 253D.07, subd. 3. Irving presented no evidence that he had been accepted into, or had even applied to, the outpatient program at CORE Professional Services.

Even if Irving had presented evidence that CORE was available and willing to accept him into its program, he failed to offer clear and convincing evidence that the CORE program was consistent with his treatment needs or the requirements of society. While Dr. Dority acknowledged that it was possible Irving could have success in an outpatient program, he also testified that a secure inpatient residential setting would be best for the safety of both Irving and the community. Dr. Dority testified that, in his opinion, an outpatient program would not be intensive enough for Irving and that he had "ruled out" less restrictive alternatives.

Dr. Marshall also acknowledged that CORE could provide services to Irving, but she also testified that Irving "needs treatment in a program that is highly structured, intense, residential, [and] in a secure setting" and that MSOP was the only program offering that degree of structure and intensity. She expressed her concern that, if Irving was in outpatient treatment, "he would say he would do it but then once he got out that he wouldn't follow through with it . . . [b]ecause he has a pattern of doing that."

Because Irving did not establish by clear and convincing evidence that a less restrictive treatment program is available and appropriate, we conclude that the district court did not err by rejecting a less restrictive alternative placement.

**Affirmed.**